553 F.2d 130
 179 U.S.App.D.C. 396
 Sarah B. STEWART, Individually and as Administratrix of the
Estate of William L. Stewart, Jr., Appellant,
v.
FORD MOTOR COMPANY and Steuart Motor Company.
Sophia RICH, Individually and as Administratrix of the
Estate of Norman Rich, Appellant,
v.
FORD MOTOR COMPANY and Steuart Motor Company.
Annie Collins CATHEY, Individually and as Administratrix of
the Estate of William Rufus Cathey, Appellant,
v.
FORD MOTOR COMPANY and Steuart Motor Company.
 Nos. 75-1676 to 75-1678.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued June 4, 1976.
Decided Feb. 9, 1977.
Rehearing Denied May 16, 1977.
 
 Fred C. Sacks, Washington, D. C., for appellants.
 Frank J. Martell, Washington, D. C., for appellee Ford Motor Co.
 Before WRIGHT and ROBINSON, Circuit Judges, and JAMESON,* Senior District Judge.
 Opinion for the court filed by J. SKELLY WRIGHT, Circuit Judge.
 Dissenting opinion filed by JAMESON, District Judge.
 J. SKELLY WRIGHT, Circuit Judge:
 
 
 1
 At approximately 9:15 A.M. on January 17, 1970 a Ford Thunderbird owned and operated by William Stewart was proceeding south on Interstate Route 95 in North Carolina. In the car were three passengers, Norman Rich, William Cathey, and Ricco Hightower, members of Stewart's band which had performed the previous evening, finishing at 2:00 A.M. and returning to their hotel at about 2:30 or 2:45 A.M. The band members arose at 7:30 A.M. and left at 8:00 A.M. en route to their next engagement. The remainder of Stewart's band was traveling in a Ford Econoline van following immediately behind Stewart's car. While approaching a bridge across the Neuces River, Stewart's car left the highway, ran along the median strip at a slight angle to the highway, struck the bridge curbing, and plunged into the river, killing all four men instantly. The car had been purchased only 12 days before and had been driven only 1,400 miles before the accident occurred.
 
 
 2
 Plaintiffs, representatives of the decedents, filed separate actions against Ford Motor Company, manufacturer of the Thunderbird, and Steuart Motor Company, seller of the vehicle,[1] alleging that the accident was caused by "a defect in the steering mechanism or brake construction" of the vehicle in breach of the seller's and manufacturer's express and implied warranties. Following extensive discovery, the four actions were consolidated for trial. Four trials were held; the first three resulted in mistrials and the fourth in a verdict for defendant Ford Motor Company[2] from which the plaintiffs appeal. Because the jury instructions given were improper, we feel it necessary to reverse and remand for yet another trial.
 
 I. EVIDENCE PRESENTED
 A. Plaintiffs' Evidence
 
 3
 Plaintiffs called four witnesses on the issue of liability the highway patrolman who investigated the accident, an occupant of the Ford Econoline named Benny Deer, and two expert witnesses who examined the Thunderbird after the accident.
 
 
 4
 Trooper H. M. Bullock of the North Carolina Highway Patrol arrived at the scene at about 9:30 A.M. He testified that Interstate Route 95 in the area of the accident is a four-lane highway with two paved 22-foot-wide roadways separated by a 40-foot-wide median. Bullock stated that on the morning of the accident the median strip was even with the highway at the place where they met, sloped slightly toward the center for drainage, was covered with grass "two or three inches high," and was wet with dew. Where the vehicle left the pavement there was a small spot of six or eight inches of sand, and the officer could see the tire marks "as the car rolled across the sand." The officer found no other marks in the sand or on the highway before the point where Stewart's car left the road. From the tire tracks Bullock could ascertain that the Thunderbird left the paved section of the highway at a slight angle and traveled on the median grass strip a distance of 61 feet before the brakes were applied. Prior to application of the brakes the tires simply "left an impact in the grass." After the brakes were applied "the grass was torn up, where the wheels had slid, were dragging across the grass. It had uprooted the grass and had torn the grass up loose from the ground, leaving slide marks." From the point where the brakes were applied the slide marks continued on the grass median a distance of 89 feet six inches in a straight line, at the same angle to the paved highway, and ended at an eight-inch-high concrete curb or abutment between the two bridges approximately 13 feet from the edge of the southbound lane of the roadway. After striking the abutment the vehicle continued through the air for a distance of 110 feet and came to rest against a concrete bridge support 20 feet after striking the ground. On direct examination Bullock estimated the speed of the vehicle as approximately 60 miles an hour when it left the highway. On cross-examination he testified that it was going "at least 60 miles an hour."
 
 
 5
 Stewart was a diabetic. As a result of tests ordered by Bullock, reports were read into the record showing that Stewart's diabetic condition was under control and not related to the accident, and that no evidence of drugs or alcohol was found in Stewart's body. Bullock further testified that he found no drugs or alcohol in the Stewart vehicle.
 
 
 6
 Benny Deer, the drummer in the Stewart band, was riding in the Ford Econoline van which was following the Thunderbird. He testified that he was sitting in the seat directly behind the driver of the van and that he and the driver were the only occupants of the van who were awake.[3] Deer observed the Thunderbird moving from the right lane of the highway to the left lane to pass another car. He testified that looking from his seat in the van, through the rear window of the Thunderbird, he could see Stewart "wrestling" with the steering wheel and Rich, the right front seat passenger in the Thunderbird, reaching over in an attempt to assist Stewart in steering the car. On direct examination Deer testified that the van was approximately three car lengths behind the Thunderbird. On cross-examination it developed that the van could have been either 60 feet or 180 to 200 feet in back of the Stewart car.
 
 
 7
 Professor Samuel S. Aidlin, who was qualified as an expert in the field of mechanical engineering, testified that a crate containing the front end of Stewart's Thunderbird was shipped to him with the request by plaintiffs' counsel that he make an examination to determine the cause of the accident. Aidlin stated that in his laboratory the wrecked front end was pried apart "layer after layer." When Aidlin reached the steering mechanism he noticed that there was a broken tie rod connecting sleeve. Aidlin then supervised the taking of metallurgical tests of the tie rod sleeves to ascertain the cause of the break. He testified that the test indicated that the sleeve was manufactured without any defects and was of the proper hardness range. He stated, however, that in threading the sleeve "one of the threads came very close to the edge of the outer surface." It was Aidlin's opinion that the cause of the accident was a fatigue failure of the adjusting sleeve which caused Stewart to lose control of the Thunderbird and which prevented Stewart from correcting its course.
 
 
 8
 On cross-examination Aidlin was questioned concerning the speed of the vehicle and the amount of time it traveled on the median strip before striking the bridge abutment. Aidlin stated that a vehicle traveling 60 miles per hour would travel the 150 feet in about 1.4 seconds and that the normal reaction time for a driver to begin taking corrective action was .75 second.
 
 
 9
 Sydney H. Avner, after qualifying as a metallurgist, testified regarding tests he had performed at Aidlin's request. In his opinion the type of fracture in the left tie rod adjusting sleeve of the Stewart vehicle was a fatigue fracture and not an impact break, the fatigue failure caused by "the sharp corner at the bottom of the thread. It was a typical stress raiser."
 
 B. Defendant's Evidence
 
 10
 Defendant called four expert witnesses on the cause of the accident. Calvin Cummings, a Ford quality control engineer and metallurgist, testified that electron microscopy of the fractured tie rod sleeve indicated that the cause of the fracture was impact rather than stress. He stated that the sleeve was bent and the fracture uneven typical characteristics of an impact fracture. He stated that typical fatigue fractures, unlike the Stewart tie rod sleeve, are clean and the severed pieces will fit back together perfectly. Cummings explained the results of simulated testing performed under his direction. A tie rod assembly, of the same type as on the Stewart vehicle, had been exposed to severe stress on a factory simulator. Although other parts of the assembly broke, the connecting sleeve remained intact. Then an excessively deep thread was placed in the connecting sleeve at the point where the Stewart connecting sleeve fractured. When this altered sleeve was placed on the simulator again no failure occurred. Cummings testified that the only time he was able to get a connecting sleeve to break was when he cut the sleeve using a hacksaw.
 
 
 11
 Cummings described tests he had conducted at the Ford proving ground using a 1970 Thunderbird, similar to the Stewart car, which had been purchased on the open market. During the tests the Thunderbird was driven at 60 miles an hour and the left tie rod connecting sleeve was severed by means of a wire running under the dashboard. The driver of the vehicle was able to bring the car to a controlled stop. The Thunderbird was then driven through an automobile handling course with the tie rod disconnected. The driver was able to control the car through the course.[4] Then the Thunderbird was subjected to a skidding test on grass with the sleeve disconnected. The resulting skid was different from that of the Stewart vehicle in that the left front wheel skewed sideways in the grass and produced a skid track much wider than that of the right wheel and the back end swung out during the skid leaving a different set of tracks. When the tie rod was severed the sleeve ground along the highway leaving a visible abrasion on the sleeve. Cummings indicated that a similar abrasion should have been found on the Stewart tie rod sleeve and a corresponding one on the highway where the accident occurred. From these tests Cummings concluded that the tie rod on Stewart's vehicle had not caused the accident.
 
 
 12
 Cummings also described two demonstrations he had performed with the Thunderbird. In one a tie rod connecting sleeve with an enlarged thread was installed. The car was driven over various surfaces for a distance of 2,000 miles. At the conclusion of the test the tie rod was intact. In another demonstration the Thunderbird was driven ahead of a 1969 Ford van of the type in which Benny Deer had been riding. At distances of both 60 feet and 180 feet both the driver of the vehicle and the right front seat passenger simulated wrestling with the steering wheel. Nothing could be seen from the van about the actions of the men inside the car.
 
 
 13
 John Redinger, a metallurgist for the company which manufactured the tie rod assembly, explained how the adjusting sleeves were manufactured and threaded. He testified that it was impossible for one thread to be cut deeper than its adjacent threads with the tapping machines utilized by the manufacturer. Redinger also testified concerning the simulated testing he had done with Cummings. Redinger stated that in his 35 years of experience, except for the hacksawed tie rod assembly, he had never seen an adjusting sleeve fail due to fatigue.
 
 
 14
 Defendant then called Dr. Lucius Walker, Professor of Mechanical Engineering at Howard University, and Dr. Richard Eisenberg, Associate Professor of Metallurgy at the University of Rochester. Both men had conducted metallurgical examinations of the Stewart tie rod conducting sleeve and testified that there was no evidence of fatigue failure. Both had also been involved in the test track demonstrations described by Cummings. They confirmed Cummings' description of the testing and his conclusion that a disconnected tie rod did not cause the vehicle to go out of control on dry pavement and that on grass the test car exhibited characteristics different from those indicated by the Stewart vehicle's skid marks.
 
 
 15
 In the test to determine whether an occupant of the van could see the movements of the driver and occupant of the Thunderbird Professor Eisenberg rode in the van in the same position as Deer. He testified that at both 60 feet and 180 feet all that could be seen from the van through the rear window of the Thunderbird was "some motion in the front seat of the Thunderbird." He could not discern any attempted turning or manipulation of the steering wheel by the driver or any type of action of the right front passenger. He could not detect what was going on, and all he could see of the inside of the Thunderbird was the back of the bucket seats.
 
 
 16
 II. REFUSAL TO GIVE REQUESTED JURY INSTRUCTIONS
 
 
 17
 In seeking reversal of the verdict for appellee, appellants allege that various errors were committed by the trial judge. We consider here only appellants' contention that the trial court erred in refusing to give the following two requested instructions:[5]
 
 Plaintiffs' Prayer for Instruction No. 2
 
 18
 In determining whether or not either or both defendants breached the express warranty that the Thunderbird was free from defects, or that it was of merchantable quality and fit for the purpose for which it was intended, you are instructed that plaintiffs need not prove a specific defect. It is sufficient, if you find from the evidence that the motor vehicle in question went out of control, causing the accident, as a result of some mechanical failure due to an obvious or hidden defect in the car which existed at the time it left Ford Motor Company.
 
 
 19
 The law does not require plaintiffs to prove the mechanical failure by specific physical evidence, nor does it require plaintiffs to prove exactly what part of the car was defective, as plaintiffs may prove the mechanical failure solely by circumstantial evidence.
 
 Plaintiffs' Prayer for Instruction No. 4
 
 20
 If you determine, after considering all of the evidence, direct and circumstantial, that the accident which took the lives of Billy Stewart, Norman Rich, and William Cathey, would not have occurred in the ordinary course of things but for the existence of a defect in the vehicle operated by decedent Billy Stewart, then you can infer that the cause of the accident arose from a defect in the manufacture or distribution of the vehicle.[6]
 
 
 21
 Appellants' Appendix at 1.
 
 
 22
 In assessing appellants' contentions three factors must be considered. They are, in brief, (1) whether the proffered jury instructions accurately reflect the law in the District of Columbia; (2) whether there was sufficient evidence in the record to establish a prima facie case under the proffered instructions; and (3) whether appellants waived the basis for liability on the part of appellee sought to be made in the proffered instructions by failing to comply with Rule 52, Fed.R.Civ.P., or by presenting their case primarily in terms of proof of a specific defect.
 
 
 23
 A. The Requested Instructions as a Statement of Applicable Law
 
 
 24
 The threshold issue before this court is the determination of which jurisdiction's law should govern. Recovery is sought for an accident occurring in North Carolina allegedly caused by a defect present at the time of sale in the District of Columbia. This case is here because it was commenced prior to reorganization of the District of Columbia court system and we sit, therefore, as a court of the District of Columbia. Under the District's choice-of-law rules it seems well settled that, given the facts of this case, District of Columbia law would govern both substantively and procedurally. See McCrossin v. Hicks Chevrolet, Inc., 248 A.2d 917, 921 (D.C.App.1964) (holding that District law seeks to protect persons who purchase in the District and that this interest is stronger than that of any competing jurisdiction in the products liability claim). See also Gilper v. Kiamesha Concord, Inc., 302 A.2d 740, 744 (D.C.App.1973) (issue of sufficiency of the evidence to establish negligence claim is procedural in the District of Columbia and accordingly is governed by the law of the forum); Miller & Long Co. v. Shaw, 204 A.2d 697, 701 (D.C.App.1964), overruled on another point, Myers v. Gaither, 232 A.2d 577 (D.C.App.1967), remanded, 131 U.S.App.D.C. 216, 404 F.2d 216 (1968) (res ipsa loquitur, being a rule of evidence, is procedural and is governed by the law of the District of Columbia); Powers v. Coates, 203 A.2d 425, 427-428 (D.C.App.1964) (same); Hutchins v. Rock Creek Ginger Ale Co., 194 A.2d 305, 306 (D.C.App.1963) (same).
 
 
 25
 It is undisputed by the parties that the District of Columbia does recognize strict liability for manufacturers and intermediate sellers who place on the market defective merchandise which later injures a consumer. Brief for appellee at 33; see McCrossin v. Hicks Chevrolet, Inc., supra, 248 A.2d at 919-920. See also Simpson v. Logan Motor Co., 192 A.2d 122, 123 (D.C.Mun.App.1963); Automobile Ins. Co. v. Williams, 111 A.2d 874, 876 (D.C.Mun.App.1955). It also appears undisputed that circumstantial evidence is admissible to prove the existence of a defect. See McCrossin v. Hicks Chevrolet, Inc., supra.[7]
 
 
 26
 In holding that the existence of a defect may be proved by circumstantial evidence, however, courts in other jurisdictions have indicated that the burden remains on the plaintiff to present evidence on two closely related points.[8] First, plaintiff must present evidence which would tend to negate causes for an accident other than a defect in the product. See Lindsay v. McDonnell Douglas Aircraft Corp., 460 F.2d 631, 640 (8th Cir.), on remand, 352 F.Supp. 633 (E.D.Mo.1972), aff'd, 485 F.2d 1288 (8th Cir. 1973); Franks v. National Dairy Products Corp., 414 F.2d 682, 684 (5th Cir. 1969); Bollmeier v. Ford Motor Co., 130 Ill.App.2d 844, 265 N.E.2d 212, 217 (1970). Second, plaintiff must present proof which would suggest that whatever defect might have existed was one introduced into the product by the defendant. See, e. g. Lindsay v. McDonnell Douglas Aircraft Corp., supra, 460 F.2d at 637; Greco v. Bucciconi Engineering Co., 407 F.2d 87, 91 (3d Cir. 1969); Elmore v. American Motors Corp., 70 Cal.2d 578, 75 Cal.Rptr. 652, 451 P.2d 84, 87 (1969) (en banc); Shramek v. General Motors Corp., 69 Ill.App.2d 72, 216 N.E.2d 244, 247-249 (1966); Wojciuk v. United States Rubber Co., 19 Wis.2d 224, 120 N.W.2d 47, 52 (1963).
 
 
 27
 The quantum of proof that must be adduced to meet these two specific requirements is not great. For example, in Franks v. National Dairy Products Corp., supra, the plaintiff offered only his own testimony that he had followed the manufacturer's instructions and ordinary care in handling grease that subsequently exploded. 414 F.2d at 685. Similarly, in the automobile accident case which was the subject of Bollmeier v. Ford Motor Co., supra, the plaintiff testified only that he had had nothing to drink and that his speed was not excessive at the time of the accident. 265 N.E.2d at 213. An inference that a defect was in a product at the time it entered the stream of commerce has apparently been allowed from proof that a product was new, see e. g., Greco v. Bucciconi Engineering Co., supra, 407 F.2d at 91, although many cases do involve conflicting evidence from which a jury could identify a specific defect which could only have resulted from manufacturer error. See, e. g., Elmore v. American Motors Corp., supra, 75 Cal.Rptr. 652, 451 P.2d at 87. See also Lindsay v. McDonnell Douglas Aircraft Corp., supra, 460 F.2d at 637 (evidence that "aircraft was substantially in the same condition at the time of crash as when it was delivered by McDonnell to the Navy"). Moreover, the burden on the plaintiff is only to negate those causes not in the control of the defendant which might reasonably have led to the accident. In identifying the causes plaintiff must negate, courts have usually required proof rebutting only the most obvious causes (such as drinking or excessive speed in automobile accident cases, see Bollmeier v. Ford Motor Co., supra ), unless the defendant has suggested some specific theories of how the accident might have happened without a defect being present, cf. Franks v. National Dairy Products Corp., supra; Dealers Transport Co. v. Battery Distributing Co., 402 S.W.2d 441, 445 (Ky.Ct.App.1966). And courts have refused to allow a case to go to the jury only in the most egregious instances of failure of proof on these two points. See, e. g., Shramek v. General Motors Corp., supra, 216 N.E.2d at 248-249 (insufficient evidence when plaintiff made no proof that a tire with 10,000 miles on it had not been abused or subjected to road conditions which could have led to a blowout).
 
 
 28
 Before turning to the question whether plaintiffs here adduced sufficient evidence to go to the jury under the proffered instructions, we must consider whether those instructions accurately state the law set out above. We have no doubt that the instructions are generally consistent with the circumstantial evidence theory of proof as accepted by the courts in the District of Columbia. Williams v. Steuart Motor Co., 161 U.S.App.D.C. 155, 494 F.2d 1074, 1080 (1974); McCrossin v. Hicks Chevrolet, Inc., supra,248 A.2d at 219-220. We also think that some duty to negate other causes is fairly implicit in Plaintiffs' Prayer for Instruction No. 4 which states: "If you determine * * * that the accident which took the (life) of Billy Stewart * * * would not have occurred in the ordinary course of things but for the existence of a defect in the vehicle operated by decedent * * *." (Emphasis added.) Further, Plaintiff's Prayer for Instruction No. 2, which would have been read in conjunction with Instruction No. 4, expressly states the jury must find a "mechanical failure due to an obvious or hidden defect in the car which existed at the time it left Ford Motor Company." (Emphasis added.)
 
 
 29
 We note that the circumstantial evidence test advanced by plaintiffs in their requested instructions has the same procedural effect as the doctrine of res ipsa loquitur that has developed in the District of Columbia. Under District law res ipsa simply allows a case to go to the jury; it raises no presumptions and it does not shift the burden of proof. See Powers v. Coates, supra, 203 A.2d at 427-428. We think, therefore, that plaintiffs' theory should similarly be treated as "a procedural rule of evidence and not a rule of pleading." Id. As such, there was no need in the instruction to identify the rule of evidence by name as long as its possible application to the facts developed at trial, as the jury found them, was clearly and accurately set out. We also note that remarkably similar instructions have been specifically approved in products liability cases in other jurisdictions. See Dennis v. Ford Motor Co., 332 F.Supp. 901, 903 (W.D.Pa.1971), aff'd, 471 F.2d 733, 735 (3d Cir. 1973); Moraca v. Ford Motor Co., 132 N.J.Super. 117, 332 A.2d 607, 610 (1974), aff'd, 66 N.J. 454, 332 A.2d 599 (1975), noted, 5 Seton Hall L.Rev. 190 (1975). In both Dennis and Moraca, as well as in Chestnut v. Ford Motor Co., 445 F.2d 967, 971 (4th Cir. 1971), the courts also held that the plaintiffs were entitled to the general instructions they sought despite the fact that their efforts during trial were devoted to proving the existence of specific defects. Finally, we think the jury can be credited with knowing that "in the ordinary course of things" cars go off the road for any number of reasons, principally the negligence of the driver. Since defendant has not suggested any theory for the accident that would be outside the ken of a jury, we think it unlikely that a jury charged with the proffered instructions would be oblivious to the plainly apparent competing causes for the Stewart automobile's leaving the road.
 
 B. The Sufficiency of the Evidence
 
 30
 We now turn to the question whether plaintiffs presented sufficient evidence to make a prima facie case under the proffered instructions. The Supreme Court of Hawaii has suggested that if an accident completely destroyed car and driver, so that no defect could be shown, recovery might "be allowed anyway as a carefully driven vehicle does not leave the road in the absence of a defect in the car." Stewart v. Budget Rent-a-Car Corp., 52 Haw. 71, 470 P.2d 240, 244 n.5 (1970). We need not go so far. The testimony of plaintiffs' witness Benny Deer supports the conclusion that something had gone wrong with the steering system. The fact that the car traveled 150 feet in a straight line before leaving the ground also supports that conclusion, since it would be reasonable to expect the driver of a responsive car to attempt to turn it away from the edge of the road. In addition, plaintiffs presented ample evidence to negate likely accident causes other than a vehicle malfunction. The driver was not drunk, drugged, or suffering a diabetic reaction. Since the brakes took effect in less than a second after he left the pavement, we can infer that he had not fallen asleep. The car was not speeding; road conditions were good; and there had not been a sudden blowout. This evidence compares quite favorably with evidence which other courts have found sufficient. See, e. g., Chestnut v. Ford Motor Co., supra, 445 F.2d at 971; Moraca v. Ford Motor Co., supra; Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69 (1960); Annot., 51 A.L.R.3d 8, 31-36 (1973). Plaintiffs were entitled to ask the jury to infer that the accident was caused by some unknown defect which caused the steering system to malfunction.
 
 
 31
 Plaintiffs were also entitled to ask the jury to conclude that the defect was attributable to the manufacturer. (Responsibility of the manufacturer for any defect plaintiffs proved was apparently not contested below.) The extreme newness of the car is itself sufficient basis for an inference that any failure in the steering system was caused by a defect for which the manufacturer was responsible. See, e. g., Henningsen v. Bloomfield Motors, Inc., supra (steering system failure in 10-day-old car); Annot., 54 A.L.R.3d 1079, 1090 (1973). See also Automobile Ins. Co. v. Williams, supra, 111 A.2d at 876. Moreover, there was no evidence that the car had been altered in any way during the 12 days Stewart owned it.
 
 
 32
 C. Whether Appellants are Barred on Appeal from Claiming Trial Court Error in Refusing to Give the Requested Instructions
 
 
 33
 Appellee argues that, regardless of whether the requested instructions accurately stated the law, appellants for two distinct reasons cannot now complain of the trial court's refusal to give these instructions. Appellee contends, first, that appellants have not complied with Rule 51, Fed.R.Civ.P., and, second, that the attempt to prove that a specific defect (i. e., the fatigue failure of the left front tie rod adjusting sleeve) foreclosed submission of the case to the jury on a more general theory such as that contained in the requested instructions. We disagree with appellee on both points.
 
 1. Rule 51
 
 34
 Rule 51[9] provides, in relevant part:No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. * * *
 
 
 35
 Appellee contends that appellants did not object to the trial court's refusal to give Instructions Nos. 2 and 4 and that, under Rule 52, appellants cannot assign this refusal as error.
 
 
 36
 Appellee's argument, however, rests on a misconception of the meaning of this rule. As courts and commentators have recognized, Rule 51 is to be read together with Rule 46,[10] Fed.R.Civ.P., which states:
 
 
 37
 Formal exceptions to rulings or orders of the court are unnecessary; but for all purposes for which an exception has heretofore been necessary it is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take or his objection to the action of the court and his grounds therefor * * *.
 
 
 38
 In order to preserve for appeal an objection to a jury instruction, thus, it is not necessary for a party to except or object "if the party's position has previously been clearly made to the court and it is plain that a further objection would be unavailing." 9 C. Wright & A. Miller, Federal Practice and Procedure § 2553 at 639-640 (1971) (footnote omitted).[11]
 
 
 39
 This was precisely the situation before the trial court in the instant case. Plaintiffs specifically requested that Instructions Nos. 2 and 4 be given. Instead the judge denied both. On the basis of the record below, it appears plain that this denial represented the trial judge's final opinion that these two instructions should not be given and that further objection by plaintiffs would have been not only unavailing but wasteful of the court's time. To hold that appellants are now precluded from complaining of the trial court's refusal to give these instructions would be an unnecessary elevation of form over substance.
 
 
 40
 Under similar circumstances other appellate courts have repeatedly reached the same conclusion. As the Seventh Circuit stated in Irvin Jacobs & Co. v. Fidelity & Deposit Co. of Maryland, 202 F.2d 794, 800-801 (7th Cir. 1953): "Rule 46 * * * provides that formal exceptions to rulings or orders of the court are unnecessary. Under Rule 51, the objection is sufficient so long as the trial judge understands plaintiff's position." On the same issue the Third Circuit has held: "Counsel must make his points clearly so that the trial judge may see what they are and if he believes they are right, follow them. But he is not required to indulge in reiterative insistence in order to preserve his client's rights." Moreau v. Pennsylvania R. Co., 166 F.2d 543, 545 (3d Cir. 1948). Another case, directly on point, is Mumma v. Reading Co., 247 F.Supp. 252 (E.D.Pa.1965), in which the court considered a motion to modify judgment following a jury verdict in a Federal Employers' Liability Act suit. The defendant contended that the plaintiff was foreclosed from raising the particular issue in question whether there was evidence of contributory negligence "because of (the plaintiff's) alleged failure to comply with F.R.Civ.P. 51." Id. at 259. Rejecting the defendant's contention, the court held that the plaintiff's requested instruction "was sufficient to call plaintiff's position to the attention of the trial judge * * * and 'reiterative insistence' was not required (quoting Moreau v. Pennsylvania R. Co., supra ). The substantive spirit of F.R.Civ.P. 51 was adequately satisfied." Id.
 
 
 41
 Appellee cites only two federal decisions to support the assertion that, in the face of appellants' failure to comply literally with Rule 51, "this Court is rendered powerless to review" the trial judge's failure to give Instructions 2 and 4. Brief for appellee at 34. The first case cited, Hoagland v. Chestnut Farms Dairy, Inc., 63 App.D.C. 357, 72 F.2d 729 (1934), was decided before the Federal Rules of Civil Procedure were adopted, and the second, Villaroman v. United States, 87 U.S.App.D.C. 240, 184 F.2d 261 (1950), was a criminal case in which this court's remarks on Rule 30, Fed.R.Crim.P. (the criminal procedure counterpart of Rule 51, Fed.R.Civ.P.; see 2 C. Wright, Federal Practice and Procedure § 481 at 275 (1969)) were dicta.
 
 2. Reliance on a General Theory
 
 42
 Neither are we persuaded by appellee's second argument as to why we should uphold denial of the requested instructions. In fact, appellee fails to cite a single authority to support its proposition that appellants' effort to prove a specific defect foreclosed submission of the case to the jury on a more general theory. Rather, the applicable precedents show that, at least in the District of Columbia, a case may be submitted to the jury on the alternative grounds of a specific defect and res ipsa loquitur. Because the instant case involves use of circumstantial evidence, and since res ipsa loquitur is but a specialized use of circumstantial evidence, it is appropriate to look at this well developed body of law.
 
 
 43
 Although the District of Columbia did, at one time, prohibit a plaintiff from trying to rely on both specific defects or acts and res ipsa loquitur,[12] the irrationality of the rule was criticized[13] and it was abandoned. The cases first rejecting the former position held that the doctrine only becomes inapplicable "when the circumstances have been so completely elucidated that no inference of defendant's liability can reasonably be made." Loketch v. Capital Transit Co., 101 U.S.App.D.C. 287, 248 F.2d 609, 610 (1957). See also Lustine-Nicholson Motor Co. v. Petzal, 106 U.S.App.D.C. 18, 268 F.2d 893, 894, 83 A.L.R.2d 738 (1959). So long as "the true cause (of the accident) is still left in doubt or is not clearly shown," introduction of some evidence to show cause would not serve to foreclose a res ipsa instruction. Lindsey v. D. C. Transit Co., 140 A.2d 306, 308-309 (D.C.App.1958). More recent cases do not qualify the principle; they seem to allow a plaintiff to rely on both res ipsa and proof of specific acts under all circumstances. Powers v. Coates, supra, 203 A.2d at 427-428 (dicta); Levy v. D. C. Transit System, Inc., 174 A.2d 731, 733 (D.C.App.1961); Honey v. George Hyman Construction Co., 63 F.R.D. 443, 451 (D.D.C.1974). Whether or not the rule is as broad as recent cases suggest, plaintiffs' case falls within its narrowest compass and therefore merited the requested instructions.
 
 
 44
 Certainly the rule represents sound policy. As recognized by the Second Circuit, to hold otherwise would penalize the plaintiff who probes deeply into the defendant's behavior. Future plaintiffs "would hesitate to introduce whatever evidence they might have available as to the cause of injury for fear that thereby they would be deprived of an otherwise appropriate (circumstantial evidence) charge." Citrola v. Eastern Air Lines, 264 F.2d 815, 817 (2d Cir. 1959), quoting from Lobel v. American Air Lines, 192 F.2d 217, 219-220 (2d Cir. 1951).
 
 
 45
 The trial court's refusal to give the requested instructions was error. Accordingly, the case is
 
 
 46
 Reversed and remanded.
 
 JAMESON, District Judge, dissenting:
 
 47
 I concur in most of Judge Wright's well considered opinion. Specifically I agree that District of Columbia law governs both substantively and procedurally; that the District of Columbia recognizes strict liability for manufacturers who place on the market defective merchandise which later injures a consumer; and that circumstantial evidence is admissible to prove the existence of a defect.[1]
 
 
 48
 The majority opinion recognizes that cases holding that the existence of a defect may be proved by circumstantial evidence have indicated that the burden remains on the plaintiff to present evidence which (1) would tend to negate causes other than a defect in the product, and (2) would suggest that whatever defect might have existed was introduced into the product by the defendant. I am unable to agree with the majority that the evidence here was sufficient to negate causes other than a defect in the automobile.
 
 
 49
 At the outset, as noted in Prosser, Law of Torts, § 103, pp. 671-673 (4th Ed. 1971), "The proof required of a plaintiff seeking to recover for injuries from an unsafe product is very largely the same, whether his cause of action rests upon negligence, warranty, or strict liability in tort." Prosser continues in part:
 
 
 50
 "The difficult problems are those of proof by circumstantial evidence. Strictly speaking, since proof of negligence is not in issue, res ipsa loquitur has no application to strict liability; but the inferences which are the core of the doctrine remain, and are no less applicable. The plaintiff is not required to eliminate all other possibilities, and so prove his case beyond a reasonable doubt. . . .
 
 
 51
 "The mere fact of an accident, standing alone, as where an automobile goes into the ditch, does not make out a case that the product was defective, nor does the fact that it was found in a defective condition after the event, where it appears equally likely that it was caused by the accident itself. But the addition of other facts tending to show that the defect existed before the accident, such as its occurrence within a short time after sale, or proof of the malfunction of a part for which the manufacturer alone could be responsible, may make out a sufficient case, and so may expert testimony."
 
 
 52
 In his discussion of "Circumstantial Evidence Res Ipsa Loquitur," Dean Prosser says in part: "The injury must either be traced to a specific instrumentality or cause for which the defendant was responsible, or it must be shown that he was responsible for all reasonable causes to which the accident could be attributed." Prosser, Law of Torts, § 39, p. 218.[2]
 
 
 53
 The applicable rule with respect to negating other causes of an accident is articulated in the cases upon which the majority relies. In Lindsay v. McDonnell Douglas Aircraft Corporation, 460 F.2d 631, 640 (8 Cir. 1972),[3] the court, in holding that plaintiff was entitled to have her case submitted to the jury on the theory of strict liability in tort, said in part: "If she can show that the crash was caused by some unspecified defect and that no other cause is likely, she has made a submissible case". (Emphasis added.)
 
 
 54
 Franks v. National Dairy Products Corporation, 414 F.2d 682, 687 (5 Cir. 1969), was an action for injuries caused by an "explosion" of shortening manufactured by the defendant. In holding that the trial court in its findings properly inferred that the explosion was due to a defect in the shortening, the court said in part:
 
 
 55
 "Thus, although there was no proof of a specific, identifiable defect, the trial judge concluded that a defect in the shortening was the cause of the splattering because such a defect is the only thing that could have caused the explosion. In short, the existence of a defect was the only reasonable inference that was left. The burden of proof was not thereby shifted: Appellee still had the burden of proving that the explosion was caused by a defect in appellant's product. It was not necessary, however, for appellee to show the specific defect in order to meet that burden." (Emphasis added.)
 
 
 56
 Greco v. Bucciconi Engineering Company, 407 F.2d 87, 91 (3 Cir. 1969), was an action by a steel company employee against the manufacturer of a magnetic steel piler. In holding that the evidence concerning malfunction of the piler from the time of its installation by the steel company was sufficient to permit an inference that the piler was defective at the time of sale, the court said in part: "We also think that there was ample evidence for the jury to find that the piler was not abnormally used, and that appellee negated all reasonable causes for the malfunction, except manufacturing defect."[4] (Emphasis added.)
 
 
 57
 More nearly in point factually, but still distinguishable, is Bollmeier v. Ford Motor Company, 130 Ill.App.2d 844, 265 N.E.2d 212 (1970), an action in strict liability against the manufacturer for personal injuries sustained when an automobile driven by the owner's son left the road as a result of alleged steering gear failure. As noted in the majority opinion, there was no evidence of drinking, and the driver testified that he was traveling at a reasonable speed. In addition, however, there was evidence that from the time the car was delivered "the Bollmeiers observed a vibration which could be seen and felt in the steering column and steering wheel" and also heard a "humming noise." Mrs. Bollmeier testified that the car had been taken to the garage "several times due to the vibration and no one at the garage told her not to drive it. Although vibration was always present when the car was driven, no one experienced any difficulty with the steering prior to the time of the accident". In holding that the trial court erred in directing a verdict for the defendant on the issue of implied warranty, the court noted that "there was substantial evidence that there was some malfunction in the car which manifested itself in a vibration in the steering" and "also expert testimony that this vibration could cause a metal failure or loosening of bolts which could occur in a steering mechanism".[5]
 
 
 58
 I turn now to the critical question of whether the evidence negating other probable causes was sufficient to warrant the instructions offered and refused by the court. First, it is clear that throughout the trial plaintiffs directed their evidence toward proving the existence of a specific defect a broken tie rod connecting sleeve as the exclusive cause of the accident.[6] Plaintiffs did not attempt to show that the accident was caused by some unspecified defect and that no other cause was likely. (Lindsay v. McDonnell, supra ).[7] Nor was there evidence raising a reasonable inference that a defect in the product's manufacture must have been a proximate cause of the accident (Franks v. National Dairy Products Corp., supra ). Nor did plaintiff's evidence negate all reasonable causes, except manufacturing defect (Greco v. Bucciconi Engineering Company, supra ), or show that the defendant "was responsible for all reasonable probable causes to which the accident could be attributed" (Prosser). In sum, the evidence did not raise a "real and substantial" issue with respect to proving an unspecified defect by negating other causes. Without such evidence the proffered instructions were properly refused. See Smith v. Mill Creek Court, Inc., 457 F.2d 589, 592 (10 Cir. 1972).
 
 
 59
 It is true that Stewart had owned the car only 12 days and that it had been driven only 1400 miles. There was no evidence, however, that any trouble had been experienced in operating the vehicle during that period, as there was in Bollmeier v. Ford Motor Company, supra, and other cases holding that other causes of an accident were negated. This evidence in itself would not permit an inference that an unspecified defect was the proximate cause of the accident. If any inference may be drawn, it would be equally, if not more, probable that the accident was due to the driver's inattention or lack of familiarity with the operation of the car and his improper application of the brakes.
 
 
 60
 The car was traveling at a speed of at least 60 miles an hour when it left the highway and entered the grass median. Less than two seconds elapsed until it struck the curb or abutment. During most of that time the brakes had been applied on the wet grass which was "uprooted" and "torn from the ground, leaving slide marks". It is reasonable to infer under these circumstances that the driver may have momentarily lost control, without having adequate time to regain the highway.
 
 
 61
 Counsel for appellant argued extensively to the jury that the accident must have been caused by the defect found by plaintiffs' experts and that there was no other reasonable cause. In turn counsel for appellee argued that Stewart might have dozed off momentarily or that when the vehicle entered the grass median, his "left front tire could have gotten over there into that soft stuff, and, reacting like a normal person would do, not panicking, he just went in a straight line. He didn't try to swerve, which at that speed could have been disastrous. He kept it in a straight line and then applied his brakes".
 
 
 62
 It is true that Deer testified that through the rear window of the Thunderbird he could see the driver and other front seat passenger struggling with the steering wheel. His testimony was discredited by tests of the defendants' expert witnesses under identical conditions. There was no testimony to dispute these tests. Plaintiffs offered no evidence of any tests which might corroborate Deer, and, as noted supra, the driver of the van the only other person in the van who was awake was not called as a witness.
 
 
 63
 I agree with the majority opinion that Rules 46 and 51 of the Federal Rules of Civil Procedure must be read together, and that as a general rule it is not necessary for a party to except or object to offered instructions if the party's position has previously been clearly made to the court and it is plain that a further objection would be unavailing. I have some question whether the rule is applicable here.
 
 
 64
 At the conclusion of the evidence, counsel participated in an off-the-record discussion on the instructions and plaintiffs' proposed instructions were denied. Prior to this discussion the trial judge advised counsel that it was his practice to discuss jury instructions in chambers, but to give both counsel an opportunity to make a complete record with respect to any errors in the instructions given. Following the charge to the jury, defense counsel specifically objected to the instruction on breach of implied warranty and requested a clarification. Plaintiffs' counsel offered no objection or request for any additional instruction, although specifically asked by the court whether he had "anything else".[8] These proceedings confirm the conclusion that plaintiffs tried the case on the theory that a specified defect was the cause of the accident and made no serious effort at any time to rely upon unspecified defects, aside from submitting, but not pressing, the two instructions.
 
 
 65
 I agree with the majority opinion that it is well settled in the District of Columbia that res ipsa loquitur is a rule of evidence and not one of pleading, and also that in a proper case a plaintiff may rely on both res ipsa and proof of specific acts. It may be noted, however, that in many of the cases reaching this conclusion, the defendant has had exclusive possession and control of the instrumentality causing the injury. See, e. g., Citrola v. Eastern Airlines, Inc., 264 F.2d 815 (2 Cir. 1959), cited in the majority opinion, where all of the passengers of an airplane were killed when the plane crashed, and the court held that the plaintiffs could rely on both specific acts of negligence and res ipsa loquitur. In applying the res ipsa rule the court emphasized that the plane was in the exclusive possession and control of the defendant. This does not mean that the absence of exclusive possession and control would in all cases preclude submission of a case to a jury on both res ipsa and specific defects.[9] It is a factor, however, which must be considered in determining whether the plaintiff has negated other probable causes of the accident.
 
 
 66
 In my opinion the case was properly submitted to the jury on the theory on which it was tried, and the evidence was insufficient as a matter of law to negate probable causes of the accident other than a defect in the automobile. Accordingly I would affirm the judgment.[10]
 
 
 
 *
 Of the United States District Court for the District of Montana, sitting by designation pursuant to 28 U.S.C. § 294(d) (1970)
 
 
 [1]
 The car was purchased in Washington, D.C. The action was filed pursuant to 12 D.C.Code § 101 (1973) and 16 D.C.Code § 2701 (1973)
 
 
 [2]
 The action against the seller, Steuart Motor Co., was dismissed upon stipulation that any verdict against the dealer would be the obligation of Ford Motor Co. Doc. 54 in Record on Appeal
 
 
 [3]
 The driver of the van was not called as a witness
 
 
 [4]
 Cummings explained that the disconnected front wheel follows the direction of the controlled wheel due to the caster or inclination of the axles which is set when the vehicle is manufactured and adjusted when the front wheels are aligned during routine maintenance. The witness demonstrated the principle by use of a chair equipped with casters
 
 
 [5]
 Instead the court instructed:
 In order for the plaintiffs to recover against the defendant Ford Motor Company, the law requires that they prove, by a preponderance of the evidence, that Ford Motor Company placed in the stream of commerce a vehicle that had a defective tie-rod sleeve, and that this defective tie-rod sleeve was the proximate cause of the accident.
 Appellants' Appendix at 1.
 
 
 [6]
 It might be argued that Plaintiffs' Prayer for Instruction No. 4 impermissibly suggests that defendant is liable even if the alleged defect in the vehicle resulted from plaintiffs' contributory negligence. Contributory negligence is, however, an affirmative defense and, in this case, defendant introduced no evidence on the issue. Moreover, it is not clear that contributory negligence is ever available as a defense to strict liability. See Noel, Defective Products: Abnormal Use, Contributory Negligence, and Assumption of Risk, 25 Vand.L.Rev. 93, 105-119 (1972)
 
 
 [7]
 Indeed, McCrossin is a remarkably parallel case. There the plaintiff sued the manufacturer and seller of a Corvette automobile which inexplicably burst into flame, resulting in a complete financial loss to the owner. Although the parties agreed that the fire had started near the carburetor, the plaintiff could not prove by direct testimony that the carburetor was defective. Nonetheless, the court held that sufficient circumstantial evidence had been presented to make out a prima facie case of a defective product against both the seller and the manufacturer. 248 A.2d at 920
 
 
 [8]
 Courts in the District have not had occasion to address these related points. In the discussion which follows we assume that the District courts would place similar burdens, in similar circumstances, on a plaintiff predicating his case on circumstantial evidence
 
 
 [9]
 It is well established that, in federal courts, allegations of failure to object to jury instructions and the consequences of such failures are procedural and not substantive issues and, accordingly, are to be governed by federal law. Batesole v. Stratford, 505 F.2d 804, 807 (6th Cir. 1974); Lester v. John R. Jurgensen Co., 400 F.2d 393 (6th Cir. 1968); McNamara v. Dionne, 298 F.2d 352, 355 (2d Cir. 1962)
 
 
 [10]
 Haynes v. Coolidge, 118 U.S.App.D.C. 348, 336 F.2d 736, 737 n.1 (1964); Montgomery v. Virginia Stage Lines, 89 U.S.App.D.C. 213, 191 F.2d 770, 773 (1951); Wright v. Farm Journal, Inc., 158 F.2d 976, 978 (2d Cir. 1947); Williams v. Powers, 135 F.2d 153 (6th Cir. 1943); 9 C. Wright & A. Miller, Federal Practice and Procedure § 2554 at 643 (1971)
 
 
 [11]
 The authors, however, correctly note that the better practice is to renew the objection at the close of the charge. 9 C. Wright & A. Miller, supra note 10, § 7553 at 640-641
 
 
 [12]
 Pistorio v. Washington Railway & Electric Co., 46 App.D.C. 479, 485 (1917); Sullivan v. Capital Traction Co., 34 App.D.C. 358, 374 (1910)
 
 
 [13]
 Note, Res Ipsa Loquitur in the District of Columbia, 45 Geo.L.J. 475, 488 (1957)
 
 
 [1]
 It may be noted that the district court did instruct the jury that circumstantial evidence should be considered in determining whether plaintiffs had met their burden of proof
 
 
 [2]
 See also Restatement, Second, Torts, § 328D relating to Res Ipsa Loquitur, which provides that negligence of the defendant may be inferred when "(b) other responsible causes, including the conduct of the plaintiff and third persons, are sufficiently eliminated by the evidence"; and Comment b on "Circumstantial Evidence" and Comment f on "Eliminating other responsible causes", which reads in part:
 "It is still necessary to make the negligence point to the defendant. On this too the plaintiff has the burden of proof by a preponderance of the evidence; and in any case where there is no doubt that it is at least equally probable that the negligence was that of a third person, the court must direct the jury that the plaintiff has not proved his case."
 
 
 [3]
 This was a suit in admiralty brought under the Death on the High Seas Act to recover for the death of a Navy pilot whose jet aircraft manufactured by the defendant crashed because of an alleged design or manufacturing defect
 
 
 [4]
 This case contains a careful analysis of Section 402A of Restatement, Second, Torts relating to "Strict Liability" and recognizes that a defendant may be liable under this doctrine even in the absence of negligence
 
 
 [5]
 Stewart v. Budget Rent-A-Car Corporation, 52 Haw. 71, 470 P.2d 240 (1970) is also distinguishable, as indicated by the following excerpt from the court's syllabus:
 "2. In a tort action by the driver of an automobile involved in an accident, where there is no eye witness to the accident other than the driver who testified that the car became uncontrollable and where the only expert who testified was unable to form an opinion because of the damaged condition of the car and the subsequent changes in the car's condition, a directed verdict against the plaintiff is not justified as a matter of law."
 The court concluded that the testimony of the driver tended to negate any causation not attributable to the defendants.
 
 
 [6]
 The record indicates that in the pre-trial proceedings before the first trial judge assigned to the case, the appellants indicated their wish to rely on both proof of a specific defect and causation by some unspecified defect. Following those pre-trial proceedings three mistrials resulted and the case was assigned to a second judge. Throughout the three mistrials and the fourth trial the plaintiffs made no attempt to present evidence on their unascertainable defect theory nor did they mention this theory to the court
 
 
 [7]
 Plaintiffs' trial brief stated that their experts would "testify that the front end of the 1970 Ford Thunderbird was delivered to their laboratory for examination, and after having conducted an exhaustive examination, reached the conclusion that the cause of the incident was a dislocated or cracked thread of the left adjusting sleeve in the steering control area, creating a point of incipient failure, their opinion that the proximate cause of the accident was failure of the sleeve resulting in lack of control of the left wheel, the vehicle pulling to the left. . . . The experts will testify that these tests established that the failure in the Thunderbird was caused by fatigue and no other type of force."
 
 
 [8]
 When defense counsel made his objection, the court said: "Well, I sent it out to you, you know, I gave it just as we had agreed on it in chambers and I sent you copies before you ever started arguing this afternoon just for that reason. But I am perfectly willing, it it is more accurate." After agreeing to the clarification requested by defense counsel, the court asked plaintiffs' counsel if he had "anything else". Counsel replied that he was concerned only with what would be done with respect to damage if the jury returned a verdict in favor of the plaintiffs
 
 
 [9]
 See Prosser, Law of Torts, § 39, pp. 219-221
 
 
 [10]
 In view of the fact that the case will be remanded for a new trial, it is unnecessary to discuss the other specifications of error. In my opinion none of them would require a reversal