878 F.2d 435
 278 U.S.App.D.C. 333
 Mary Kate SIEGEL, Personal Representative of the Estate of
Steven Alan Siegel, Appellant
v.
MAZDA MOTOR CORPORATION.
Mary Kate SIEGEL, Personal Representative of the Estate of
Steven Alan Siegel
v.
MAZDA MOTOR CORPORATION, Appellant.
 Nos. 88-7148, 88-7165.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 4, 1989.
Decided June 23, 1989.
Rehearing and Rehearing En Banc Denied in No. 88-7148 Aug. 3, 1989.
 
 Appeals from the United States District Court for the District of Columbia (Civil Action No. 85-02896).
 Milton Heller, with whom J. Philip Kessel and Paul F. Rothstein, Washington, D.C., were on the brief, for appellant in No. 88-7148 and for appellee in No. 88-7165.
 Edward S. Digges, Jr., with whom Michael T. Wharton, Annapolis, Md., was on the brief, for appellee in No. 88-7148 and for appellant in No. 88-7165.
 Before MIKVA, SILBERMAN and D.H. GINSBURG, Circuit Judges.
 Opinion for the Court filed by Circuit Judge D.H. GINSBURG.
 Dissenting opinion filed by Circuit Judge MIKVA.
 D.H. GINSBURG, Circuit Judge:
 
 
 1
 This strict product liability action, which arises from a one-car accident in Washington, D.C., comes before this court for the second time. In Siegel v. Mazda Motor Corp. (Siegel I), 835 F.2d 1475 (D.C.Cir.1987), we vacated the district court's denial of defendant Mazda's motion for judgment notwithstanding the verdict, and remanded the case for reconsideration. We now review the district court's order on remand, granting Mazda's motion for judgment n.o.v. and requiring each party to bear its own costs. We affirm the judgment for Mazda on the merits and remand in order for the district court to reconsider Mazda's request for costs under Fed.R.Civ.P. 54(d).
 
 I. BACKGROUND
 
 2
 As we recounted in Siegel I, 835 F.2d at 1477 (footnote omitted):
 
 
 3
 The automobile accident that led to the death of Steven Alan Siegel, and gave rise to this lawsuit, occurred on the morning of January 27, 1984 on Rock Creek Parkway in the District of Columbia. The vehicle involved was a new Mazda 626 LX which Siegel had purchased some three months earlier. Prior to the accident, Siegel had operated the car without incident. He had experienced no mechanical difficulties, and no repair or maintenance work had been done on the vehicle.
 
 
 4
 At the time of the accident, Siegel was taking his customary route to work; he was proceeding southbound on a winding section of the Parkway. The weather was cold, clear and dry; some snow and ice from a recent snowstorm remained on the roadside. Rounding a turn, Siegel's Mazda left the road, hit the curb, slid across snow-covered grass abutting the Parkway, struck a water fountain, and came to rest, upside down, in swollen Rock Creek.
 
 
 5
 ... By [the time that rescue workers extricated the car], Siegel had suffered brain damage so severe that he was never able to relate what he perceived or believed to have gone awry. Siegel died some sixteen months after the accident.
 
 
 6
 Mary Kate Siegel, widow of Steven Alan Siegel, commenced [a] wrongful death action against Mazda ... in the [district court], invoking federal jurisdiction on the basis of the parties' diversity of citizenship. At trial, plaintiff endeavored to prove entitlement to recover on two alternative theories. First, plaintiff charged breach of an implied warranty; she contended that minute metal particles in the Mazda's power steering fluid had jammed the steering gear, and that this specific defect had caused the car to leave the roadway. Second, she invoked a strict product liability theory charging that some general, i.e., unspecified, defect, attributable to Mazda, caused the accident.
 
 
 7
 Upon examination of the special verdict form used by the district court, we could not "tell what, if any, determination the jury made on the implied warranty theory." Id. at 1478. The jury did, however, return a verdict for the plaintiff, with damages of $832,896.46, on her strict product liability claim. Mazda thereupon moved for judgment n.o.v., having previously moved for a directed verdict. See Fed.R.Civ.P. 50. The district court denied judgment n.o.v., noting that the parties had presented conflicting evidence on the respective roles of mechanical failure and driver error as causes of the accident. In particular, the district court understood our decisions in Stewart v. Ford Motor Co., 553 F.2d 130 (D.C.Cir.1977) (applying District of Columbia tort law), and Hall v. General Motors Corp., 647 F.2d 175 (D.C.Cir.1980) (same), to permit a verdict for the plaintiff even if the evidence, as a whole, seems insufficient to the trial judge to support findings of "car difficulty and the lack of driver error."
 
 
 8
 On Mazda's appeal of this ruling in Siegel I, we "exercis[ed] our 'best guess' on the content of District of Columbia law" as follows: "[T]o warrant submission of a case to the jury under the product liability-circumstantial proof test advanced in Stewart, there must be sufficient evidence of car difficulty and lack of driver error so that a reasonable person could find it more probable than not that the accident occurred because of a vehicle malfunction." 835 F.2d at 1477 (emphasis added). Because of the variance between our reading of D.C. law and that of the district court, we vacated the judgment and remanded for the district judge to rule anew on Mazda's motion for judgment n.o.v. After additional briefing and oral argument, the district court granted the motion.II. STANDARD OF REVIEW
 
 
 9
 The general principles that govern our review of a judgment entered n.o.v. are set forth in Morgan v. District of Columbia, 824 F.2d 1049, 1056 (D.C.Cir.1987):
 
 
 10
 [W]e apply the same standard that the trial court must apply in its initial consideration of the motion.... A judgment n.o.v. should be entered only if "there can be but one reasonable conclusion" drawn from the evidence.... In reviewing the motion, we may not weigh the evidence; we are required to evaluate the evidence under the presumption that the jury resolved all factual disputes in favor of the prevailing party.
 
 
 11
 The corollary, as stated in McNeal v. Hi-Lo Powered Scaffolding, Inc., 836 F.2d 637, 641 (D.C.Cir.1988), is that: "Because we ask the 'same question' asked by the trial court, we owe no deference to, and are not guided by, its decision."
 
 
 12
 As applied to this case, these principles, together with Siegel I, which is both binding circuit precedent and the law of the case,* require us to ask whether a reasonable jury could have found it "more probable than not" that the accident here resulted from an unspecified defect in the Siegels' motor car rather than from driver error. In this inquiry, we "must consider all of the evidence offered by the parties," mindful that "the question for us is not whether there was some evidence, but whether, in terms of 'the actual quantum and quality of proof necessary to support liability,' there was sufficient evidence upon which a jury could properly base a verdict for the [plaintiff].... To survive a motion for judgment n.o.v., the evidence [she] introduced has to be more than merely colorable; it must have been significantly probative if the jury's verdict is to stand." Richardson v. Richardson-Merrell, Inc., 857 F.2d 823, 827, 828-29 (D.C.Cir.1988) (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986)) (emphases in original).
 
 
 13
 III. MOTION FOR JUDGMENT N.O.V.
 
 
 14
 Before turning to the contested evidentiary questions in this case, we note the material facts, relevant to man versus machine culpability, that are not in dispute. During the three months between the purchase of their new Mazda and the accident, the Siegels experienced no problems with the car and did not have it serviced. On the other hand, Steven Siegel was in excellent health prior to the accident, and an analysis done after the accident revealed no trace of alcohol or drugs in his blood at the time; nor had Steven Siegel received any traffic tickets or been involved in any auto accident prior to the one that took his life. In short, it is agreed that none of the usual indicia of probable cause were in evidence on one side or the other. Against this background, we turn to the disputed facts.
 
 
 15
 On the morning of the accident, Morton Taubman was jogging northward on a path alongside the southbound lanes of Rock Creek Parkway. He heard the sound of screeching tires behind him and turned around at the moment that Steven Siegel's car, facing south, struck the curb at the western edge of the roadway. Standing approximately 100 feet away, Taubman then saw the car slide across a snow-covered grassy area at a speed he estimated at 30 to 35 miles per hour--the latter being the maximum legal speed for the adjoining portion of the Parkway--then strike a water fountain, and fall into Rock Creek.
 
 
 16
 Photographs of the accident scene show tire marks proceeding from the left to the right southbound lane and then, in a right turn, leading off the roadway. Richard Sanderson, a defense expert qualified as to both power steering and accident reconstruction, stated that these marks were consistent with either a sharp right turn or a sideways slide of the car.
 
 
 17
 George Barse, plaintiff's expert in power steering but not in accident reconstruction, testified that if one were to assume--as Taubman's testimony would suggest--that the tire marks in the photographs were made by the two front tires of the car, then those tires must have been turned 30 degrees to the right, which is just short of the maximum turning angle of 31 degrees. For that to have happened, the driver would have had to turn the steering wheel one and one-half revolutions to the right.
 
 
 18
 In addition to evidence of the turning angle, plaintiff sought to show that microscopic particles from improperly molded parts inside the power steering system had entered the surrounding fluid, causing that system to continue turning the steering wheel to the right in response to only a slight turn by the driver. Plaintiff originally presented this evidence at trial to support her specific defect count but, on remand, having abandoned that count, argued that the particulate evidence could "be used [to show] a potential for the general [i.e., unspecified] defect." To that end, Edward Holdsworth, whose laboratory had performed a microscopic analysis of the steering system fluid, testified that the power steering fluid in the Siegels' Mazda contained substantially more large particles--those greater than 30 microns--than "exemplar fluid" taken from a comparable Mazda car with similar mileage. After reviewing these data, plaintiff's expert, Barse, opined that, from an engineering standpoint, the particles "were capable of" causing the extreme right turn. In response to a question from the district judge, however, Barse acknowledged that a malfunction in the power steering system would leave the car's manual steering capability unimpaired, so that the driver could have countermanded any mechanically prolonged turn.
 
 
 19
 Plaintiff places great emphasis upon defendant's Workshop Manual for the Mazda model 626. This document, intended as an aid to mechanics, states that when the "[s]teering wheel pulls to one side," one of four "probable cause[s]" is a "[m]alfunction of the steering gear," specifically, a misalignment of the input shaft and valve sleeve. This evidence merely indicates one "probable" source of the steering problem once one knows with certainty that a turn was caused by a mechanical defect; it is not probative, however, with respect to the antecedent question whether a particular turn was the result of such a defect or of driver error.
 
 
 20
 For its part, defendant both sought to disprove plaintiff's particle theory and offered several alternative explanations for the accident. As to the particle theory, the defendant "introduced evidence indicating that the shearing forces present in the power steering system would prevent any metal particles that found their way into the operative parts of the steering column from hindering the power-assist feature and that, in any case, loss of power steering would not compromise manual steering capabilities." Siegel I, 835 F.2d at 1478.
 
 
 21
 Concerning alternative explanations for the accident, Richard Sanderson, an expert on accident reconstruction, noted that Steven Siegel had to round a leftward curve in the Parkway before reaching the straightaway portion from which his car left the road. Sanderson hypothesized that the car might have come around the curve at an excessive speed, resulting in a loss of control and a skid. Alternatively, Steven Siegel might have been travelling in the extreme left lane on the understandable but erroneous assumption that all four lanes of the Parkway were reserved for southbound traffic. Approximately three days of each week, Siegel drove to work with his wife before 9:30 a.m., when all four lanes of the Parkway are reserved for southbound traffic; on the other two work days, he drove alone at various times later in the morning, depending upon his schedule of appointments. On the day of the accident, Siegel was driving alone to work at approximately 10:00 a.m., when only the two right lanes are for southbound traffic. Had he suddenly sought to move his car to one of the proper southbound lanes, Steven Siegel might have induced a sideways skid.
 
 
 22
 The evidence thus leaves us with several scenarios: that Steven Siegel, in the few seconds before his car left the Parkway, (1) somehow failed to countermand the steering wheel, even as it turned by itself a full one and one-half revolutions due to a malfunction in the power steering system, or (2) that he simply skidded sideways (a) as a result of excessive speed or (b) because he suddenly veered to the right upon realizing that he was in the wrong lane. When the record thus contains competing, unrebutted hypotheses consistent with driver error, proof that a mechanical defect was merely "capable of" causing the accident does not satisfy the standard of Siegel I that such an explanation be "more probable than not." In this case, we can discern no basis upon which to say that any one of the possible explanations is "more probable" than the others. For the jury to have made such a choice under these circumstances required it to engage in sheer speculation--precisely the type of inquiry that D.C. law, as we read it in Siegel I, forecloses.
 
 
 23
 We draw further support for this conclusion by comparing the plaintiff's evidence here with our discussion, in Siegel I, of the types of proof that enabled the plaintiffs in Stewart and Hall to reach the jury. In Stewart, the plaintiffs not only negated such causes as alcohol, drugs, or driver drowsiness, they also presented:
 
 
 24
 ... eye witness testimony [from] an occupant of the vehicle that had followed the Thunderbird [involved in the accident] from the start of the journey. Through the rear window of the Thunderbird, the witness saw the driver "wrestling" with the steering wheel and observed the front seat passenger reaching over in an attempt to assist the driver in steering the car.... This testimony ... "support[ed] the conclusion that something had gone wrong with the steering system."
 
 
 25
 Siegel I, 835 F.2d at 1479 (quoting Stewart, 553 F.2d at 139). The plaintiffs in Hall presented evidence on "the numerous mechanical difficulties [that they] had experienced with their new car, and their several return trips to the dealer seeking correction of these problems." Siegel I, 835 F.2d at 1480. From this evidence, a reasonable juror might have found that the car "was defective when purchased, was never put in proper repair despite the owner's repeated efforts to secure correction, and went out of control as a result of some mechanical failure attributable to the manufacturer." Id. By comparison, the evidence offered by the plaintiff here does not amount to the "reasonably specific negation of driver error" required by Siegel I.
 
 
 26
 In the alternative, plaintiff raises a legal argument for reversal of the judgment n.o.v., but it is really no more than a makeweight. Specifically, plaintiff contends that she was entitled to a jury verdict in light of the common law presumption of due care on the part of a decedent. See, e.g., McNeal, 836 F.2d at 645 n. 17 (applying District of Columbia law). In Siegel I, however, we made it clear that, in order to reach the jury in a strict product liability case, the plaintiff must come forth with "proof distinctly tending to show mechanical problems." 835 F.2d at 1480. We quite agree with defendant that a simple presumption of due care is insufficient, in light of our interpretation of District of Columbia tort law in Siegel I, to enable the plaintiff to reach the jury; indeed, if such a presumption were enough, then there would be no room ever for a directed verdict or judgment n.o.v., and that is clearly not the law.
 
 
 27
 Since neither the evidence nor the law entitles the plaintiff to a jury verdict, we affirm the judgment for the defendant.
 
 IV. COSTS UNDER RULE 54
 
 28
 Rule 54(d) of the Federal Rules of Civil Procedure states that "costs shall be allowed as of course to the prevailing party unless the court otherwise directs...." In the administration of this rule, we have stated that "a court may neither deny nor reduce a prevailing party's request for costs without articulating some good reason for doing so." Baez v. United States Department of Justice, 684 F.2d 999, 1004 (D.C.Cir.1982) (citing consistent precedent from the ten circuits to have considered the question). Nonetheless, in response to defendant's request for costs, the district court ruled that "[e]ach party shall bear its own costs" without setting forth any reason therefor. In light of Baez, both parties concede, and we agree, that a remand is necessary in order for the district court to reconsider defendant's request for costs and, if it should once again deny the request, for the court to state its reason(s) for doing so.
 
 V. CONCLUSION
 
 29
 Having concluded that plaintiff failed to show that a reasonable juror "could find it more probable than not that the accident occurred because of a vehicle malfunction," Siegel I, 835 F.2d at 1477, we affirm the district court's order insofar as it granted judgment n.o.v. to the defendant. Since the court failed, however, to set forth any reason for denying defendant's request for costs under Rule 54, we remand for the district court to reconsider that request.
 
 
 30
 So ordered.
 
 MIKVA, Circuit Judge, dissenting:
 
 31
 When we sit in diversity, we owe our loyalty not to the law as we would like it to be, but rather to the law of a particular jurisdiction as it currently exists. I believe that District of Columbia law permits circumstantial evidence of the smallest quantum to serve as the basis for a jury verdict, and that the district court erred in granting the defendant's motion for judgment despite the jury's verdict to the contrary. I am compelled to dissent from my colleague's otherwise perceptive opinion.
 
 
 32
 The District of Columbia jealously guards the province of the jury, and denies judges the right to "reweigh[ ] evidence already submitted to the jury," Rich v. District of Columbia, 410 A.2d 528, 536 (D.C.1979), or to "usurp * * * the prime function of the jury as the trier of facts," Baber v. Buckley, 322 A.2d 265, 267 n. 1 (D.C.1974) (quoting Lind v. Schenley Industries, Inc., 278 F.2d 79, 90 (3d Cir.), cert. denied, 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960)). This is the substantive law of the forum. As Judge Wright noted in Stewart v. Ford Motor Co., 553 F.2d 130, 138 (D.C.Cir.1977), "courts have refused to allow a case to go to the jury only in the most egregious instances of failure of proof." The District of Columbia Court of Appeals has accordingly held that "[o]nly when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear," Simpson v. Logan Motor Co., 192 A.2d 122, 124 (D.C.1963) (quoting Lavender v. Kurn, 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916 (1946)), and that "[o]nly if there were absolutely no facts or circumstances from which a jury could reasonably have found that [the defendant was] negligent and that such negligence was the proximate cause of the injury, would the question have been one for the court," McCoy v. Quadrangle Development Corp., 470 A.2d 1256, 1259 (D.C.1983); see also Weil v. Seltzer, 873 F.2d 1453, 1457 (D.C.Cir.1989) (party entitled to instruction on a theory of liability so long as it is supported by more than a "scintilla" of evidence) (quoting Doe v. Binker, 492 A.2d 857, 860 (D.C.1985)).
 
 
 33
 Tort law in the District of Columbia permits a theory of liability to be submitted to the jury on much slimmer evidence than was presented in this case. For example, in Guardian Insurance Co. v. Anacostia Chrysler-Plymouth, Inc., 320 A.2d 315 (D.C.1974), cited with approval in Payne v. Soft Sheen Products, Inc., 486 A.2d 712, 724 n. 14 (D.C.1985), the Court of Appeals reversed a judgment n.o.v. for the defendant, holding that expert testimony that "it was possible," id. at 316, for an automobile fire to have started in wires under the front seat was sufficient to take the case to the jury. This is indistinguishable from the expert testimony in the case sub judice that a defect in the power steering system was "capable of" causing the accident. See Majority opinion ("Maj. op.") at 438. Similarly, in Rich v. District of Columbia, 410 A.2d 528 (D.C.1979), the Court of Appeals reversed a judgment n.o.v. for the defendant, on the ground that the "trial judge seems to have required too high a standard of proof" for the plaintiff to take the case to the jury, id. at 532. The court permitted the jury to infer that the plaintiff had fallen and been injured because of a hole in a sidewalk on the basis of photographs taken one week after the accident and testimony from another resident of the neighborhood that a number of bricks were missing from the sidewalk, see id. at 530. There was no direct evidence that the hole had actually caused the plaintiff's fall; indeed, the plaintiff herself admitted that "[a]t the time of the occurrence, [she] did not see what caused her to fall." Id. Nonetheless, the court noted that a plaintiff need only adduce evidence from which a jury could reasonably infer that the plaintiff had fallen because of a missing brick; any other "quantum of proof is not necessary." Id. at 533.
 
 
 34
 The expert testimony in the case sub judice that particles in the power steering fluid "were capable of" causing the accident was more than adequate to create a jury question. There is no requirement that a single piece of evidence must establish by itself that a defect more likely than not caused the accident. See Oxendine v. Merrell Dow Pharmaceuticals, Inc., 506 A.2d 1100, 1110 (D.C.1986). "In ruling for a motion for judgment n.o.v., the court must view the evidence as a whole, not in fragments." Id. As the majority acknowledges, we must evaluate the evidence "under the presumption that the jury resolved all factual disputes in favor of the prevailing party." Maj. op. at 437 (quoting Morgan v. District of Columbia, 824 F.2d 1049, 1056 (D.C.Cir.1987)).
 
 
 35
 Here, a power steering defect was supported by a considerable array of evidence. Plaintiff introduced testimony from a Mazda engineer who admitted that metallic particles in the power steering fluid could have obstructed the clearances between the valve sleeve and input shaft and caused the mechanism to self-steer. In fact, on December 23, 1983, before the accident but after the sale of the vehicle, Mazda had issued a service bulletin reflecting a design change of the bearing in the power steering pump from a "plain bushing" to a ball bearing, because the former type of bearing was encountering durability problems. Plaintiff suggested that bearing disintegration was a likely source of particles in the power steering fluid.
 
 
 36
 After the accident, an expert witness, George Barse, removed a sample of fluid from the valve of the power steering system in the Siegels' car. The valve would have been the site of any possible blockage. Laboratory results showed that the accident vehicle fluid had a greater number of large particles (those likely to cause a jam) than a sample from another Mazda 626 driven a comparable number of miles:
 
 
 37
 Particle size Fluid from Accident
(in microns) New Fluid Other Mazda Vehicle
-------------------------------------------------------
1020 48.7 540.3 65.7
2030 5.2 26.9 13.8
3040 2.1 4.0 13.8
50k 0 2.7 17.3
 
 
 38
 Barse testified that in his opinion the large particles found in the laboratory test "could" have jammed between the valve sleeve and the input shaft, causing the front wheels of the Siegels' car to turn 30 degrees. Both the eyewitness account of Mr. Taubman and photographs of tire marks in the road were consistent with this theory, as was a photograph of the car after the accident showing the wheels turned sharply to the right.
 
 
 39
 The evidence introduced by the plaintiff to negate driver error also tended to show that a defect in the power steering caused the accident. There was evidence before the jury that Siegel was a good driver, that he was not speeding, that he was not under the influence of drugs or alcohol, and that there was no ice or water on the roadway. Moreover, the nature of the accident supported the defect theory; plaintiff introduced evidence that the angle at which the car left Rock Creek Parkway would have required the driver to turn the wheel one and a half full turns to the right.
 
 
 40
 This was the evidence on which the jury formed its verdict. The jury obviously found that driver carelessness or inattention did not produce the extreme turn which caused the accident. The jury could reasonably have concluded that all this evidence, "taken in combination," Oxendine, 506 A.2d at 1110, made it more likely than not that a defect in the power steering caused the accident. That is all that is needed in this jurisdiction for the jury's verdict to be valid.
 
 
 41
 My colleagues are unwilling to follow this line of reasoning; they believe that our prior decision in Siegel v. Mazda Motor Corp., 835 F.2d 1475 (D.C.Cir.1987) (Siegel I ) foreclosed a plaintiff win. I disagree. Siegel I held that "the cumulative effect of plaintiff's proof must make it reasonable to conclude that the accident, more likely than not, resulted from a vehicle malfunction," 835 F.2d at 1480 (emphasis added). The evidence presented must be viewed as a whole, because "[p]roof negating driver error may sometimes simultaneously support an inference that a problem with the car caused the accident, and the converse may also hold true." Id. If in Siegel I we had believed that the plaintiff could not prevail under this standard, we should have disposed of the case directly, by ordering the district court to grant Mazda's motion for judgment n.o.v. Instead, we remanded the case to the district court. Thus, Siegel I is silent on the issue in this appeal: whether the plaintiff presented a sufficient quantum of evidence, under District of Columbia law, to submit the case to the jury. I do not see how an opinion that explicitly left open the issue of the adequacy of plaintiff's proof, see 835 F.2d at 1480, can be read as dictating the result in this case. It should be noted that my colleagues, who are willing to affirm the granting of Mazda's motion, have no greater information than did the Siegel I panel; the record in both cases is the same.
 
 
 42
 When a driver is killed in an automobile accident there is a two-dimensional tragedy. In addition to the monumental loss of a husband and loved one, there is the loss of a principal witness to the tragedy. Only Mr. Siegel could have known for certain what happened to cause his vehicle to veer sharply and finally into the creek. The law recognizes that less-than-certain evidence may have to suffice to affix liability. A jury of peers made the determination that the evidence adduced put the blame on Mazda. We ought not and the District of Columbia precedents admonish us not to reassess that delicate and necessarily imperfect process of finding truth and distributing justice. I would reverse the trial court's decision granting judgment n.o.v. for the defendants, and reinstate the jury verdict.
 
 
 
 *
 Accordingly, Siegel I precludes our inquiring anew into District of Columbia tort law, as our colleague in dissent would have us do