**Thomas G. CORCORAN, Jr., Plaintiff,**

v.

**GENERAL MOTORS CORPORATION, Defendant.**

**No.  Civ.A. 98–2191–LFO.**

United States District Court,
District of Columbia.

Jan. 5, 2000.

Henry M. Lloyd, William C. Casano, Boykin & Casano, Washington, DC, Thomas G. Corcoran, Jr., Kathleen S. Rice, Berliner, Corcoran & Rowe, Washington, DC, for plaintiff.

Michael D. Jones, Charles E. Duross, Kirkland & Ellis, Washington, DC, for defendant.

## MEMORANDUM

OBERDORFER, District Judge.

On August 14, 1998, the plaintiff filed a personal injury complaint against General Motors in Superior Court. It alleged that defects in a 1987 Chevrolet Corvette designed, manufactured and sold by GM, caused it to go out of control so that the plaintiff drove it into a wall (instead of the car in front of him) in order to bring it to a

stop. The plaintiff sought compensation in the amount of $5,000,000 in compensatory damages and $5,000,000 in punitive damages for negligence, $5,000,000 in unspecified damages for breach of warranty and $5,000,000 in unspecified damages for strict liability. On September 14, 1998, GM removed the suit to this Court. On November 5, 1998, the plaintiff was ordered to designate experts and expert reports by February 15, 1999; he did not do so.

On March 3, 1999, GM filed a motion for summary judgment. The plaintiff represented that additional discovery would provide him with proof of a defect in either the design or manufacture of his brakes. On April 9, 1999, I denied the motion for summary judgment without prejudice and allowed discovery to continue. On July 15, 1999, the defendant renewed its motion for summary judgment based on the plaintiff's continuing failure to designate experts or expert opinions. The plaintiff opposed the motion on August 12, 1999. On August 13, 1999, the plaintiff filed an errata to is statement of disputed issues to correct typos and grammatical mistakes in the original. On September 28, 1999, the defendant replied. On September 2, 1999, the defendant filed a motion to strike exhibits 5 and 6 from the plaintiff's opposition because, as documents about brake failure experienced by other GM owners and authored by either the Wall Street Journal, a GM employee or another GM owner, they constitute hearsay. On September 20, 1999, the plaintiff filed an opposition to the motion to strike the exhibits. On October 1, 1999, the plaintiff moved to amend the complaint to drop the breach of warranty claim and disperse the damages sought under it to the other claims.

On October 1, 1999, the plaintiff moved to amend the complaint to drop the breach of warranty claim and to add a request for punitive damages to the strict liability count. At oral argument on October 13, 1999, the plaintiff represented that he was dropping the negligence, breach of warranty and strict liability design defect claims. On October 14, 1999, the defendant consented to the motion to drop the breach of warranty claim, but moved to strike the request for punitive damages. On October 29, 1999, the plaintiff opposed the motion to strike.

A pretrial conference was held on December 14, 1999; it addressed all three pending motions.

In an order dated October 15, 1999, I denied the defendant's July 15, 1999 motion for summary judgment. I also denied as moot the motion to exclude exhibits 5 and 6 from consideration of the summary judgment motion since they were irrelevant to my analysis. I stated in the order that I would issue a memorandum explaining my ruling. Upon reflection, I have determined that the October 15 order should be vacated and a judgment for the defendant should be granted. Therefore, the motion to amend the complaint is denied as moot. An accompanying order effects these decisions.

Background

The following is undisputed: in 1987, the plaintiff purchased a new Chevrolet Corvette manufactured by the defendant. The plaintiff drove the car approximately 3,000 miles a year. During the first seven-and-a-half years that the plaintiff owned the Corvette, it passed all of its inspections and its brakes needed no repairs. On August 18, 1995, the plaintiff was injured when, unable to slow the Corvette to avoid colliding with a car ahead of him, he turned it and collided with a wall.

The events leading up to the August 18 collision are also undisputed and are well displayed in the plaintiff's deposition: he that he drank some wine before entering his car.

> It's my secretary's birthday; so I took her to the University Club to buy her a drink. And at the same time, I chose the white wine of the month or the red wine of the month, I forget which.

And I had a glass of white wine, which was a full glass of wine. And then there were three or four tasting glasses of wine, that is, he just ... poured in a little bit so I could taste them....

... I didn't finish the glasses except for the last glass, which was the best one, and I finished that.

...

Q. And that secretary is Sue Lucas?

A. Yes.

Corcoran Dep. at 110–11.

Q. How long do you think you were at the University Club?

...

Twenty minutes to forty minutes.

...

Q. When you left the University Club, Sue Lucas came with you?

A. Yes.

Q. And you were going to drive her home?

A. I did drive her home.

...

Q. Did you go to straight to the car after leaving the University Club or did you go back to the office?

...

A. I think I went right to my car.

Corcoran Dep. at 116.

The plaintiff testified that the car operated normally during the drive:

Q. Did you notice any unusual sounds in your Corvette in driving Ms. Lucas home?

A. No.

Q. Did any indicators alight in your vehicle when driving Ms. Lucas home?

A. Nope.

Q. The brake pedal seemed normal when depressing it, when driving Ms. Lucas home?

A. I don't remember anything unusual.

1. At his deposition, the plaintiff identified the Circle at the intersection of Nebraska and Wisconsin Avenues as Westmoreland Circle.

Q. Do you remember anything unusual about the car at all in driving Ms. Lucas home?

A. No.

Corcoran Dep. at 119–20.

After leaving Ms. Lucas at her home, the plaintiff continued to his home. He drove northeast on Nebraska Avenue approaching Tenley Circle.[1] Corcoran Dep. at 122–23. He testified.

Q. And while driving home before the accident, did the brakes appear to be working fine?

A. Yes.

Q. There was no trouble with the car whatsoever?

A. No.

Q. No trouble?

A. None.

...

Q. Were you speeding?

A. Well, the speed limit I think is 25. It's possible I was going 25. It's possible I was going 20.

Q. But you think you were going somewhere between 20 and 30 miles per hour?

A. yes.

Corcoran Dep. at 124–25.

What happened next is disputed. The plaintiff testified at his deposition that as he neared Tenley Circle, he noticed the car in front of him, which was 5 to 7 car lengths ahead, begin to slow. "I could see the car ahead of me was slowing down, and I was closing, as we say in the Navy, with the car in front of me." Corcoran Dep. at 127.

The plaintiff testified that although he stepped repeatedly and even "stomped" on the brake, the car accelerated:

Q. When you saw that car slowing, what did you do?

It is actually known as Tenley Circle. GM's Mot. For Summary Judgment at 6 & n. 3.

A. I put my foot on the brake, my right foot.

. . .

Q. So the car slowed in front of you and you put your right foot on the brake.

And describe for me what happened at the point.

A. The brakes gave way and went to the floor, and I picked my right foot up, and I—the second time I hit the brake, I might not have—it went to the floor. And then I hit it again, I think, fairly moderately.

And then . . . I began stomping on the brakes just as hard as I could with my right foot. I go boom and hold for a second, and I'd go boom and hold for a second. . . .

I tried to—the car accelerated. I mean, it was rolling down the hill, so it was gathering speed, and I was about to go into this car in front of me, and I was bashing this—the brakes with my right foot.

And just before I was going to go into this car, I went in the left lane to avoid the car. All the time, I kept pounding on the brakes with my right foot. And at some point, I tried to ram it into park. . . .

And I kept—I kept smashing down the brake with my right foot, you know, rhythmically, boom, boom, boom. And I got into the left-hand lane, but this, you know, it's only—it was a solution for about a second because there was some car coming up in the left-hand lane; so I couldn't go in the left-hand lane. So I began to look for some way to escape the situation without having a head-on collision with this car.

And so I looked to my left, and there were people going along the sidewalk, and I had to find some way to stop this car without killing these people. And there was a little driveway there into a parking lot, and the parking lot parallels Nebraska; so if I could do a 180, it was just—just by accident it was there. And if I could do a 180 into this parking lot, I thought I could stop the car by going up the street, I mean, up the parking lot because the parking lot was on roughly the same grade as Nebraska Avenue.

. . .

. . . And I was hoping actually I was going to make a 180, but the car only made a 90 degree turn. So I went through—I went through a street light and then went into a wall.

Q. A street light not being a traffic signal but—

A. No. It was a light to light the street.

Q. And you hit that and went through it?

A. I went right through it.

Q. And knocked it down?

A. I sure did.

Corcoran Dep. at 129–133.

The plaintiff testified that the car accelerated through the incident. He also admitted that it is possible that he hit the accelerator:

Q. When this whole event was occurring, you were looking out the windshield and the windows, is that true?

A. Yes, just the windshield because the top is down. There are no side windows up.

Q. You weren't looking at your feet?

A. No.

. . .

Q. When we spoke earlier . . . I asked you if you were sure that you did not hit the accelerator.

And I believe you told me that you could not rule that out; is that correct?

A. Well, I can't it's impossible.

. . .

Q. . . . . [Y]ou felt the car accelerating during this time?

A. Yeah, but you know, it was accelerating because it was falling down the

hill. It wasn't accelerating because I was hitting the accelerator.

Q. But you felt it accelerated?

A. It felt like it accelerated, yeah.

Corcoran Dep. at 140–41.

At his deposition, the plaintiff proffered evidence that the car experienced an increase of speed of at least 20 miles per hour before it hit the wall at 50 miles per hour:

Q. You mentioned in a previous letter that you hit the wall at approximately 50 miles an hour; is that correct?

A. It's the way it seemed. I mean I wasn't looking at the speedometer.

Corcoran Dep. at 143–44.

The events following the accident are undisputed. At no time after the crash did the plaintiff have an engineer inspect the brakes:

Q. Did you have an engineer look at the brakes?

A. No.

Corcoran Dep. at 167.

When an inspector from the plaintiff's insurance company checked the brakes on August 22, 1995, he found no defects:

During my inspection of Mr. Corcoran's Corvette, I found that the brake pedal pumped up properly. By this, I mean that when I depressed the brake pedal there was resistance and the pedal returned to its upright position when it was released. Beyond checking the brake pedal, I did not inspect the Corvette's braking system due to the extent of the damage to the vehicle.

Jan. 21, 1999 Decl. of Tri Rust Pursuant to 20 U.S.C. § 1746. ¶ 4.

After the crash, the plaintiff's insurance company paid him $18,000 for title to the Corvette. Corcoran Dep. at 168–69. The insurance company then sold the car as salvage. Decl. of Kim Zimmerman Pursuant to 28 U.S.C. § 1746, ¶ 4. The purchaser, Kim Motor Company, Inc. represents that "[b]ased on the condition of the Corvette, there did not appear to have been any repairs done to the vehicle after the accident, before we purchased it." *Id.* On February 23, 1996, Kim Motor sold the car to Richard Beers; Kim Motor made no repairs to the vehicle before the sale. Id. at ¶¶ 5–6.

After Beers purchased the car, he substantially repaired its body and began driving it. He did not make any repairs to the brakes until two years later:

I repaired the hood and grill assembly, including the headlights. The car's frame was straightened in front of the front wheels. The radiator and the windshield were replaced. I replaced the front and rear brake pads about two years after I started driving the Corvette. Other than the replacement of the brake pads, neither I nor anyone else has ever done any repairs to the brakes or replacement of brake components on my Corvette since I have owned the vehicle.

Declaration of Richard L. Beers, Jr. Pursuant to 28 U.S.C. § 1746 ¶ 3.

Mr. Beers also represents:

I drove the car before I replaced the brake pads and have driven the car after I replaced the brake pads.

In the nearly three years that I have owned the Corvette and in the approximately 11,000 miles that I have driven the car, I have not experienced any problems with the brakes on my Corvette. I did not have any problems with the Corvette's brakes before I replaced the brake pads and, likewise, I have not had any problems with the brakes after I replaced the brake pads. I have never experienced a brake failure in my Corvette, and I have never experienced a situation in which the brake pedal in my Corvette went all the way to the floor when I depressed it.

Based on my personal experience with my Corvette, I have no reason to believe that the brakes on the car are defectively designed or defectively manufactured. The brakes on my Corvette have always

performed properly and in no way out of the ordinary.

*Id.* at ¶¶ 4–6.

In February of 1999, a GM expert on brake systems inspected the Corvette, then in the possession of Mr. Beers. He found no evidence of brake failure like the plaintiff described:

I inspected both the front and rear brakes and examined the master cylinder and booster.

The brakes on the Corvette appeared to be fully functional and in proper working order. I inspected the brakes for leaks and found none in the entire system. The brake pedal was firm and provided normal resistance when depressed. The fact that the pedal generated and maintained pressure indicated that there was not an internal or external leak in the brakes.

I examined the master cylinder and the booster and found them to be in no way out of the ordinary. The master cylinder reservoir was full, which again indicated that there were no leaks in the brake system.

. . .

If there had been a brake failure in this Corvette, I would expect to see a non-functioning brake system at this time, unless repaired. To the contrary, my inspection revealed a functioning brake system. . . . My inspection revealed no evidence of brake failure as plaintiff has described it.

It is my opinion that plaintiff's crash was the result of driver error, rather than brake failure. It is further my opinion that the Corvette's brakes are not defectively designed or manufactured, and that an alleged brake failure in the brakes did not cause plaintiff's accident.

Affidavit of David I. Buist ¶¶ 7–9, 12–13.

Another GM expert attempted to reconstruct the accident based on the plaintiff's estimates of the location and speed of the Corvette prior to and during the crash.

He determined that the Corvette could not have accelerated 20 or 30 miles on Nebraska Avenue without propulsion independent of the grade of the hill:

I conducted six drive-throughs of the accident approach at speeds of 20, 23, 24, and 30 miles per hour. When the Corvette reached the crest before the descent on Nebraska Avenue, I allowed the Corvette to coast until it reached the eastern entrance of the American University driveway. The Corvette was in "drive" for four of the tests; I downshifted to first gear at the crest on one simulation, and I shifted the Corvette to neutral at the crest of the final simulation. Using this procedure, I was able to determine how much of an increase in speed was attributable to the downhill grade on Nebraska Avenue.

The Corvette used for the test increased in speed between 0 and 3 miles per hour as a result of the grade on Nebraska Avenue. When the Corvette was allowed to cruise at the highest end of the range of speed given by the plaintiff, 30 miles per hour, there was no increase in speed. Shifting the Corvette to neutral did not appear to make any perceivable difference as to the increase in speed. Downshifting the car to first gear resulted in a substantial loss of speed.

It is my opinion that plaintiff's Corvette could not have increased in speed by 20 to 30 miles per hour as a result of the slight downhill grade on Nebraska Avenue just west of Tenley Circle. Based on my simulations, plaintiff's Corvette only could have increased in speed by a marginal amount, without some other source of acceleration.

It is my opinion that because plaintiff steered his Corvette into a sharp turn attempting to reach the American University driveway, some of the Corvette's forward speed would have dissipated before plaintiff crashed into the wall bordering the driveway, unless there was an independent source of acceleration.

Even if plaintiff's brakes had failed immediately before the August 18, 1995 accident, any small increase in plaintiff's speed due to Nebraska Avenue's downhill grade would have been lost in plaintiff's sharp turn towards the American University driveway.

Affidavit of Bruce R. Bowman at ¶¶ 17–20.

The plaintiff does not contest the findings of the GM experts. Instead, he argues that he could not have stepped on the accelerator because if he had, "the car would lurch forward." Opp. To Mot. For Summ.Judg. at 18. He also asserts that the experts are biased due to their employment with GM, *id.* at 3, and that they performed incomplete and irrelevant analyses. *Id.* at 5. He states:

GM's experts do not even address, much less explain, what would have happened if plaintiff had in fact repeatedly floored the accelerator in his 5.7 litre 8 cylinder, 300 horsepower Corvette, as they opine he must have mistakenly done. . . . GM's proffered "accident reconstruction" expert, Mr. Bowman, did not even attempt to "reconstruct" what would have happened under GM's theory of the case; in fact, he did nothing whatsoever with respect to acceleration tests or simulations.

*Id.*

The plaintiff also argues:

Mr. Buist spent at most forty-five minutes "inspecting" the various components, including taking thirty-one pictures of the parts "inspected", Buist Depo. 220–241, and searching for and writing down part numbers of the various parts "inspected". Buist Depo. 230–231. Mr. Buist did not drive the car as part of his evaluation, but testified that testing the brakes could include a variety of tests he could have performed by driving the vehicle, and that he would have done so if the present owner had allowed it. *Id.*, 242–246.

Opp. To Mot. For Summ.Judg. at 19–20.

Further, the plaintiff theorizes that the brake failure was "intermittent". *Id.* at 6.

Accordingly, he argues that it is consistent with his theory that neither the insurance adjuster nor the GM expert experienced failure when they depressed the brakes.

Finally, the plaintiff seeks to retract his deposition testimony that the car was traveling at 20–30 miles per hour before the brakes supposedly failed, and 50 miles per hour at impact:

[T]he opinions of GM's proffered accident reconstruction and brake design and performance experts assume that plaintiff's vehicle accelerated from a speed of 20 to 30 miles per hour to a speed of 50 miles per hour from the time plaintiff first pressed on what he testified was the brake pedal to the time his Corvette crashed into the wall. Bowman Depo. 160–162; Affidavit of David I. Buist ¶ 13 (GM Ex. K). This assumption is based exclusively on plaintiff's testimony that it "seemed" like he hit the wall at 50 miles per hour (Corcoran Deposition, 143–144 (GM Ex. B)), and that it "felt" like he was accelerating "as the car was falling down the hill" immediately prior to the crash. *Id.* at 140. However, plaintiff's testimony reflects only his subjective impression of the speed at which his vehicle was traveling just before it crashed into the wall. Plaintiff's impressions do not establish that the vehicle was actually traveling at that speed, or that it was in fact accelerating immediately prior to the crash.

. . .

Additional evidence in the record gives rise to the reasonable inference that plaintiff's estimation of the vehicle's speed at the time of the crash overstate the speed of the vehicle and therefore his estimate is not a reliable foundation for the opinions of GM's experts.

. . .

Plaintiff's estimate that he was traveling somewhere between 20 and 30 miles per hour immediately before he first applied the brake is just that—an esti-

mate; a subjective impression of the speed at which his vehicle was traveling. Corcoran Deposition, 125 (GM Ex. B). Plaintiff testified that he was "moving along" with the traffic; that he "might have been closing the gap" with the people ahead of him, but he didn't really remember; that it was "possible" he was going 30, or "possible" he was going 25, or "possible" he was going 20. *Id.* Given this testimony, it is reasonable to infer that it is "possible" that he may have been going 35 or 40 as well, depending on how fast the traffic was "moving along."

. . .

. . . [A] trier of fact could reasonably conclude from the evidence and the favorable inferences drawn therefrom, that plaintiff crashed into the wall at *less* than 50 miles per hour, and that his vehicle was traveling at a speed *greater* that 20 to 30 miles per hour before the events leading to the accident occurred.

Opp. To Mot. For Summ.Judg. at 10–11; 16, 17, 23.[2]

The plaintiff now questions whether the vehicle increased in speed at all, stating in his brief: "if the car increased in speed during this period, which is uncertain . . ." *Id.* at 24. At the December 14, 1999 oral argument, the plaintiff represented that he will not assert that any significant increase in speed occurred. Rather, he intends to argue solely that the brakes failed to engage.

The last disputed matter is the plaintiff's deposition testimony that the Corvette's brakes failed a week before the accident and that as a result, the plaintiff brought it to a service station to be checked:

Q. Other than this accident, did the Corvette's brakes ever fail?

A. Yes.

Q. When was that?

A. Some days before the accident maybe a week. . . .

. . .

A. I pulled out of my driveway into the little alley behind my house and . . . the brakes. . . . So I started to push on the brakes, and they failed, that is, the brakes went down and the car—there was no braking power. The brakes sort of gave way.

And then about 10 or 15—maybe 10 feet later, I mean, I want to take back those feet. Sort of a moment later, the brakes took hold and stopped the car. . . .

Q. Did you think you had to get the brakes checked out?

A. I took it to a gas station.

Q. When was that?

A. Immediately . . .

Q. Did the brakes work after that?

A. Yes.

And they worked getting into the gas station when you slowed down to get into the gas station?

A. They worked every time until the accident, which was somewhere between a few days and a week later.

. . .

A. . . . I told the guy, "The brakes momentarily failed or appeared to fail. And could you check it out?"

I'm not certain. I might have been more specific than that. I might have said—I don't remember exactly what I said. I do remember that he checked the brake fluid.

Q. That guy was Martin Elwell?

A. Yes.

Corcoran Dep at 76–79, 86–88.

The plaintiff does not remember whether Elwell inspected the brakes or found anything wrong with them:

Q. And you said this guy Martin Elwell checked out the brakes?

---

**2.** It is noteworthy that the plaintiff recanted his deposition testimony about the speed of his Corvette at relevant times during the accident only after the defendant's experts determined that the plaintiff's version of the events were physically impossible.

**64**

A. No. All I remember is that he checked the brake fluid.

Q. Was the brake fluid low?

A. I don't actually remember.

Q. Did you have to pay for the brake fluid?

A. I don't remember that either.

. . .

Q. Did he look under the vehicle at the brakes or look at the brake pads or do anything else besides looking at the brake fluid?

A. I think all he did was the brake fluid, but I don't actually remember.

Q. What did he tell you in terms of your brake failure?

A. . . . I don't remember that he told me anything.

Corcoran Dep. at 88–90.

Not only does Mr. Elwell deny finding a problem with Mr. Corcoran's brakes, he claims that he does not even remember looking at them:

I have no independent recollection of Mr. Corcoran coming to the station in August of 1995 or any other time prior to his accident and telling me about any problem with his brakes. Nor do I have any recollection of checking his brakes or brake fluid at any time.

Declaration of Martin Elwell pursuant to 28 U.S.C. § 1746, ¶ 4.

The plaintiff claims that Mr. Elwell recalls the incident, but is feigning ignorance to avoid involvement:

Q. Have you had any conversations with Martin Elwell since the time of the accident?

. . .

A. Yes. Believe it or not, I can't remember whether I talked to him on the telephone or I actually saw him. He told me that he remembered my coming to the Citgo station and remembered my telling him that—that the car—that the brakes had momentarily failed. And he remembered looking to see whether there were—to see whether the—to check the brake fluid.

He said he did not remember topping up the brake fluid. He was quite definite about that. I then asked him—not at that time. I called him back later. . . . I said at that time I would like to take his statement or take his deposition. He told me that he didn't want to give a deposition and that he was considering—he was moving to Texas. And then when I called him later, he refused to give me a deposition and said that if I call him for deposition, he wouldn't remember.

Corcoran Dep at 210–12.

Mr. Elwell is not, and never has been, a mechanic. He explains:

My position at the Brookville Citgo station in 1995 (and today at the Connecticut Avenue Citgo station) is that of cashier and gas attendant. I am not a certified automobile mechanic, and I have never performed mechanics jobs at the stations where I have worked.

Elwell Decl. at ¶ 5.

The plaintiff claims that he told his wife about the first alleged brake failure before the accident occurred. Corcoran Dep. at 92. After the accident, the plaintiff told the claim representative from his insurance company that he had had brake trouble a week before the accident. Declaration of Julie A. Sexton Pursuant to 28 U.S.C. § 1746.

**I.**

Summary judgment is warranted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed.R.Civ.P. 56(c). The evidence is viewed in a light most favorable to the nonmoving party and that party is entitled to all favorable inferences which may reasonably arise from the evidentiary materi-

als. *Beard v. Goodyear Tire,* 587 A.2d 195, 198 (D.C.1991) (internal citations omitted). If the moving party makes an initial showing that there is no genuine issue of material fact, the burden shifts to the nonmoving party to show that an issue exists. *Id.* The nonmoving party will be unable to establish a genuine issue of material fact for trial unless there is sufficient evidence which would allow a jury to return a verdict for that party. *Anderson v. Liberty Lobby,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Therefore, the evidence must be viewed "through the prism of the substantive evidentiary burden." *Id.,* 477 U.S. at 253, 106 S.Ct. at 2513. "[I]n the event the trial court concludes that the scintilla of evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free to direct a judgment, Fed.Rules Civ.Proc. 50(a), and likewise to grant summary judgment, Fed. Rule Civ.Proc. 56." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Basically, summary judgment is appropriate if there is no genuine dispute about a material fact that is, if the evidence is such that no reasonable jury could return a verdict for the nonmoving party. *Id.,* 477 U.S. at 248, 106 S.Ct. at 2510.[3]

■ Since the plaintiff represented in his pleadings and at oral argument that he wishes to abandon the negligence and breach of contract counts of the complaint, the only claim to be addressed on summary judgment is that GM is strictly liable for a manufacturing defect in the plaintiff's Corvette. To carry the burden on such a claim,

> a plaintiff must prove by a preponderance of the evidence that: (1) the seller was engaged in the business of selling the product that caused the harm; (2)

the product was sold in a defective condition unreasonably dangerous to the consumer or user; (3) the product was one which the seller expected to and did reach the plaintiff consumer or user without any substantial change from the condition in which it was sold; and (4) the defect was a direct and proximate cause of the plaintiff's injuries.

*Warner Fruehauf Trailer Co., Inc. v. Boston,* 654 A.2d 1272, 1274 (D.C.App.1995) (citations omitted). A product may be found defective if it has a manufacturing defect. *Id.* at 1274.

■ In a manufacturing defect case, a plaintiff may seek to prove either a specific defect (that a specific, identifiable part of the car was defective and caused the accident) or a general or unspecified defect (which the jury can infer from the accident itself). *Pappas v. Ford Motor Co.,* 7 F.Supp.2d 22, 26 (D.D.C.1998). Judge Joyce Hens Green has summarized the law of this Circuit as follows:

> To prove a specific defect in an automobile case, plaintiffs generally introduce expert testimony based on examination of the accident vehicle. (Citation omitted). To prove an unspecified defect, plaintiffs generally introduce circumstantial evidence, and expert opinion based thereon, that some defect attributable to the manufacturer must have been the cause of the accident. (Citation omitted).

*See Pappas,* 7 F.Supp.2d at 26 citing *Siegel v. Mazda Motor Corp.* 835 F.2d 1475, 1477 (D.C.Cir.1987)*(Siegel I)* and *Siegel v. Mazda Motor Corp.,* 878 F.2d 435, 437 (D.C.Cir.1989)*(Siegel II).*

■ The plaintiff represented in his summary judgment briefs and at the October 13, 1999 oral argument that he was proceeding solely on a theory of a general manufacturing defect. At the pre-trial conference on December 14, 1999, howev-

---

**3.** The difference between motions for summary judgment and directed verdicts is procedural: they arise at different points in the trial. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511–12. The burden is the same. *Id.* Therefore, I have applied the precedent of directed verdict cases to the resolution of this motion.

er, the plaintiff indicated that he may introduce a specific defect theory; he mentioned that a defect in the master cylinder may have caused the brakes to fail.

The plaintiff's specific defect theory implicates technical and scientific knowledge of how the master cylinder works and malfunctions. If the theory is "so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson," controlling caselaw requires the plaintiff to proffer expert testimony to explain the theory to the jury. *Hull v. Eaton Corp.*, 825 F.2d 448, 455 (D.C.Cir.1987) (citations omitted); *Beard*, 587 A.2d at 200; *District of Columbia v. Freeman*, 477 A.2d 713, 719–20 (D.C.1984).

The theory that the master cylinder in the plaintiff's Corvette had a defect is one for which precedent requires expert testimony. Average lay people do not possess the requisite knowledge to determine whether a defect in the master cylinder could have caused the plaintiff's crash. Yet, the defendant has not proffered an expert who inspected his Corvette's master cylinder, or who will testify that a defect in it would cause the kind of malfunction the plaintiff allegedly experienced. He also offers fails to proffer an expert who will testify either that such a malfunction would and could occur twice during the life of the car and never again, or that such a malfunctioning master cylinder would lack any trace of the malfunction after it occurred. Requiring the plaintiff to support his theory with an expert is especially necessitated by GM's undisputed proffer of an expert who is prepared to testify that he found no evidence of a malfunction in the master cylinder, and that if one occurred, physical evidence would remain until the malfunction was fixed. Since the plaintiff has proffered neither an expert nor physical evidence to support his theory or rebut GM's expert, he is precluded as a matter of law from proceeding on a specific defect theory.

■ The plaintiff may proceed without an expert on a general defect theory if the circumstantial evidence is sufficient for him to carry his burden. To prove a general manufacturing defect the plaintiff must proffer:

(1) evidence tending to negate causes for the accident other than a defect in the car, and

(2) evidence tending to show that the defendant-manufacturer introduced into the car whatever defect might have existed.... *Proof that the product was new* would warrant a jury inference that a defect, if there was one, existed at the time the product entered the stream of commerce.

*McFarlane v. Caterpillar, Inc.*, 974 F.2d 176, 179 (D.C.Cir.1992) (emphasis added).

Our Circuit stated in 1977 that the proof required to meet these two elements is not great. *See Stewart v. Ford Motor Co.*, 553 F.2d 130, 137 (D.C.Cir.1977). In 1987, however, our Circuit instructed that in order to maintain a manufacturing defect claim against a motion for judgment as a matter of law, a plaintiff must show that it is more likely than not that the accident was caused by a mechanical defect attributable to the manufacturer. *See Siegel I*, 835 F.2d at 1480.

At a minimum, meeting this standard requires the plaintiff to offer evidence showing difficulties with a vehicle prior to, or at the time of, the accident and tending to negate causes other than a defect in the vehicle, including a "reasonably specific negation of driver error". (citations omitted). We have found several factors relevant to this showing: the age of the vehicle, its service history and testimony as to the possibility of alternative causes. (citations omitted). It is not enough for a plaintiff to prove that a mechanical defect was capable of causing the accident. In the absence of evidence that one possible explanation is more probable than another, the jury will not be allowed to speculate as to which actually caused it.

*McFarlane*, 974 F.2d at 180.

■ In addition a court appraising a motion for judgment as a matter of law

"must consider all of the evidence offered by the parties," mindful that "the question for us is not whether there was some evidence, but whether, in terms of 'the actual quantum and quality of proof necessary to support liability', there was sufficient evidence upon which a jury could properly base a verdict for the [plaintiff] . . ." (citations omitted). *Siegel II*, 878 F.2d 435, 437.

At this stage, the assertions of the non-moving party must be considered true. The plaintiff alleges that while driving his 300 horsepower Corvette on a slight downgrade at between 20 and 30 miles per hour, he was coming too close to the car in front of him; he attempted to apply the brakes, the car did not slow down, but rather served to accelerate to as much as 50 miles per hour; he swerved into the oncoming lane, swerved back, turned his car 90 degrees into a driveway and struck a wall. He asserts that the Corvette's one previous brake failure, to wit, a single episode of failure and re-engagement occurred during the week before the accident. He claims that he took the car to a service station to be inspected and that a Martin Elwell inspected the brakes and found nothing wrong. Mr. Elwell disavows any knowledge of this incident, but the plaintiff claims that he fabricated the denial to avoid involvement in the case. The plaintiff also claims that he told his wife and an insurance adjuster about the initial brake failure. He does not unequivocally deny that he stepped on the accelerator; in his inexpert opinion, however, if he had stepped on the accelerator instead of the brake the Corvette would have "surged" forward.

There is additional undisputed evidence that before the accident, the plaintiff had driven his car for approximately 23,000 miles over a seven and a half year period without any brake failure. After the accident, Mr. Beers drove the car another 11,000 miles without any brake failure. Neither owner of the car had any repairs done to the brakes except for the replacement of the brake pads two years after the accident. Indeed, during his December 14 oral argument the plaintiff's counsel asserted that the brakes are in the same condition today that they were in when they left GM. In addition, neither the plaintiff's insurance adjuster nor GM's expert, both of whom inspected the plaintiff's car, found any indication of brake failure. GM's reconstruction expert was of the opinion that the car could not have accelerated 20 or 30 miles without propulsion independent of gravity. Finally, undisputed evidence shows that the plaintiff consumed some wine shortly before the accident.

In *McFarlane*, our Circuit affirmed a directed verdict granted by the trial court in a manufacturing defect case due to the plaintiff's failure to negate possible alternate explanations for the accident at issue. *Id.* at 180. Mr. McFarlane's accident involved a bulldozer, which was seven months old, that had experienced difficulties with its hydraulic system since its delivery. *Id.* at 176. Numerous mechanics had investigated and tried to fix the system. *Id.* The accident occurred when the bulldozer lost all power and started to roll down a fifty-foot slope. *Id.* Mr. McFarlane, who had considerable experience operating bulldozers, tried to apply the brakes with the foot pedal. *Id.* The brakes failed to engage, so Mr. McFarlane unsuccessfully tried to stop the vehicle with the bulldozer blade. *Id.* Lastly, Mr. McFarlane attempted to shift the bulldozer into gear. *Id.* It would not shift. *Id.* Mr. McFarlane testified that in the morning on the day of the accident he had been using the bulldozer, and he had experienced mechanical difficulties with gears, the emergency lights had flashed and the instruments indicated that the pressure was low. *Id.* Someone tried to fix the bulldozer at that time. *Id.* at 181. Immediately following the accident, the General Superintendent from Mr. McFarlane's place of employment inspected the bulldoz-

er and failed to find any mechanical problem. *Id.* at 180.

The District Court granted judgment j.n.o.v. pursuant to Federal Rule of Civil Procedure 50(b) because the " 'meager circumstantial evidence' of a defect (citation omitted) consisting only of Mr. McFarlane's 'not unbiased' testimony that he pressed the brake pedal and it did not work, (citation omitted) was not sufficient to show a general defect under the District of Columbia law." *Id.* at 178. Likewise, if the instant plaintiff proffers no more evidence than his own "not unbiased" testimony that he stepped on the brake and it failed to engage, then the plaintiff cannot meet the burden of proving a general defect under District of Columbia law.

Persuasive to our Circuit in *McFarlane* was that the plaintiff "failed to offer sufficient testimony to negate the possibility of alternative explanations for the accident." *Id.* at 180. The McFarlanes had claimed that no evidence suggested operator error, but the Circuit determined that the inspection immediately following the accident, which revealed no mechanical defect, indicated that operator error had occurred. *Id.* The *McFarlane* Court also emphasized that the plaintiff's testimony on cross-examination "that he tried to apply the brakes with his right foot, was inconsistent with his deposition testimony that he normally applied the brakes with his left foot and the accelerator with his right." *Id.* Finally, in *McFarlane*, the District Court deemed self serving testimony by the plaintiff denying driver error biased and insufficient to negate alternate explanations for the accident; our Circuit affirmed. *Id.* at 177, 181. The Circuit agreed with the District Court's finding that "[i]t is entirely possible, as Caterpillar suggests, that Mr. McFarlane inadvertently stepped on the decelerator [sic] instead of the brakes." *Id.* at 180 (internal citation omitted).

■ Our case is similar to *McFarlane* in many ways. First, an insurance adjuster inspected the Corvette's brakes within a week of the accident and failed to find a problem. The plaintiff himself insists that the brakes are in the same condition today as they were in at the time of the accident, yet the failure has not reoccurred, and no experts have found any problem with the brakes. Second, the plaintiff offers inconsistent testimony about whether the car accelerated before the crash. The plaintiff claimed at his deposition that the Corvette accelerated to 50 miles per hour after he stepped on what he thought was the brake, and that during the relevant period leading up to the crash, he was not looking at his feet. After GM's expert asserted that the Corvette could not have accelerated 20–30 miles per hour in the few seconds prior to the accident without propulsion independent of the grade of the hill, the plaintiff changed his theory and asserted that the car did not accelerate, but that the brakes just failed to engaged. Third, the only evidence indicating mechanical failure and negating driver error is the plaintiff's self serving testimony. He asserts without independent corroboration that the brakes failed and re-engaged during the week before the accident.[4] He also theorizes that the gas station attendant who inspected the car after the first alleged failure is feigning ignorance to avoid involvement in the case. Further, the plaintiff argues that he could not have inadvertently stepped on the accelerator because the Corvette lurches forward when the accelerator is pressed, no such lurch occurred at the time of the accident and the 300 horsepower car would have accumulated an enormous amount of speed if he had "stomped" on the accelerator several times.

---

4. It is noteworthy that the plaintiff did not bring the car to a mechanic at this point and continued to drive it. The plaintiff's assertion of previous failure, like the uncorroborated self serving declarations in *McFarlane*, is insufficient to persuade a reasonable juror that there was a latent defect introduced by the manufacturer seven years prior to, and not experienced in the four years since, the accident.

The lack of independent evidence to corroborate the plaintiff's inconsistent, self serving testimony and inferences that a reasonable jury might draw from the defendant's consumption of wine shortly before the crash sustain the "the possibility of alternative explanations for the accident."[5] *McFarlane* at 180. Indeed, the plaintiff's testimony does not foreclose a reasonable juror from concluding that the alleged first incident of brake failure was also the result of driver error, or that during the second incident, the plaintiff stepped on both the accelerator and the brake in such sequence that the car briefly accelerated as he once testified, to such an extent as to overwhelm the effect of his subsequent application of the brakes in the brief interval before the struck the wall, or both.[6]

Even if the plaintiff had enough evidence to negate alternate causes of the accident, he has insufficient evidence to show that the age and service history of his car support an inference of a manufacturing defect. The Corvette was seven and a half years old when the accident occurred. The plaintiff had driven it continually, if intermittently, throughout the seven year period of his ownership and had never experienced brake trouble. He has not produced an expert who can testify that after seven years, brake failure would suddenly occur due to a manufacturing

defect, but leave no physical evidence of the failure. The plaintiff has also produced no evidence to support a claim that brake failure would occur twice within a week, but then not reoccur. Finally, although brake failure in a new car gives rise to the inference that a defect existed when the car entered the stream of commerce, *McFarlane* at 179, this inference is unavailable to the plaintiff, whose complaint involves a seven and a half year old car which he drove approximately 23,000 miles without incident.

The plaintiff has failed to proffer evidence that negates alternate explanations for driver error or indicates that the age and service history of the Corvette support an inference of a manufacturing defect. He would have this Court ask a jury to speculate as to the cause of the crash. Our Circuit expressly prohibits this jury reach. Since a reasonable jury could not find that it is more probable than not that a defect caused the crash, an accompanying order grants summary judgment.[7]

5. Although in some cases the question of whether the plaintiff's driving ability was impaired might be a question of fact that needs to be proven by objective evidence, such as a Breathalyzer test, in a general manufacturing defect case, it is the plaintiff's burden to "negate the possibility of alternate explanations of the accident." *McFarlane* at 180. Without such evidence, the plaintiff cannot negate the possibility that alcohol impairment was a factor in the alternate explanation—driver error.

6. Taking the plaintiff's inexpert theory that the car would lurch forward if he "stomped" on the accelerator of his 300 horsepower Corvette as true would not prevent a reasonable juror from finding that in the excitement of the moment, the plaintiff might not have noticed any lurch that might have occurred when the Corvette accelerated.

7. It is unnecessary to resolve whether exhibits 5 and 6 are hearsay. If admitted, they would go to the issues of whether "GM had notice of the existence of an unreasonably dangerous defective condition in the braking system of its 1986 through 1990 Corvettes, and to show that the opinion testimony of GM's proffered brake design and performance expert and its accident reconstruction expert is unreliable because, inter alia, they failed to consider these complaints in formulating their opinions." Opp. To Mot. To Exclude Exhibits at 10. Since the exhibits fail to shed light on the possibility or impossibility of alternate explanations for the accident, or on the age and service history of the vehicle, they are irrelevant to the resolution of this summary judgment motion.